Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission and Philadelphia Electric Company, Intervening Appellee *v.* Commonwealth of Pennsylvania, Appellant.

Argued October 8, 1975, before President Judge
BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKIN-
SON, JR., MENCER, ROGERS and BLATT.

*Philip P. Kalodner,* Special Assistant Attorney Gen-
eral, with him *Gerry J. Elman,* Deputy Attorney General,
and *Robert P. Kane,* Attorney General, for appellant.

*Charles F. Hoffman,* Assistant Counsel, with him *Susan M. Shanaman,* and *Edward J. Morris,* Counsel, for appellee.

*Ernest R. von Starck,* with him *Kenneth R. Myers,* and, of counsel, *Edward G. Bauer, Jr.,* and *Morgan, Lewis & Bockius,* for intervening appellee.

*Samuel B. Russell,* with him *W. Edwin Ogden,* and *Ryan, Russell & McConaghy,* for amici curiae, Metropolitan Edison Company and Pennsylvania Electric Company.

OPINION BY JUDGE KRAMER, March 5, 1976:

This is an appeal by the Commonwealth of Pennsylvania from a final order of the Pennsylvania Public Utility Commission, adopted March 25, 1975 and entered April 8, 1975, adjudicating all of the issues presented in a public utility rate case in which the Philadelphia Electric Company (PEC) sought increased rates for electric service rendered to its customers. The only issue raised by the Commonwealth in this appeal is whether the Commission erred by permitting PEC to collect increased revenues under the lowest of three rate schedule supplements to its tariff, which were filed simultaneously to become effective on the same date, while at the same time suspending the two higher rate schedules, pending final determination of the case. PEC has filed a motion to quash the Commonwealth's appeal, alleging that the Attorney General, in the name of the Commonwealth, may not file an appeal contesting an adjudication of the Commission. We will hold that the Commission did not commit an error of law and deny the motion to quash. To provide some understanding, it is necessary to set forth the following pertinent facts.

PEC is a public utility subject to the provisions of the Public Utility Law (hereinafter Act)[1]. On January 31, 1974, it filed simultaneously three separate and progressively higher rate schedules designated as supplements Nos. 30, 31 and 32 to its "Tariff Electric-Pa. PUC No. 24," each of which was designated to become effective April 1, 1974. Supplement No. 30 was designed to increase revenues 3.7 percent, or approximately $24,000,000, and by its terms was intended to supersede Supplement No. 29, which was in effect on the date of the rate filing. Supplement No. 31 was designed to increase revenues an additional 8.5 percent, or approximately $54,000,000, and was intended to supersede Supplement No. 30. Supplement No. 32 was designed to increase revenues an additional 8.8 percent, or approximately $58,000,000, and was intended to supersede Supplement No. 31. In other words, PEC intended to increase its revenues by a total of approximately $136,000,000.

On March 22, 1974, the Commonwealth filed a formal complaint, alleging that the requested increases were unjustified and unreasonable, and requesting that the proposed tariff revisions be suspended. The complaint alleged that the Commonwealth was a substantial consumer of PEC; and, in a formal answer, PEC admitted that the Commonwealth was a substantial consumer with an interest similar to that of other consumers.

On March 26, 1974, the Commission ordered an investigation of the proposed rate changes *in all three* of the Supplements filed by PEC. On the same date, by a separate order, the Commission suspended the effectiveness of Supplements Nos. 31 and 32 from April 1, 1974 to October 1, 1974 (six months); and by order of September 30, 1974, the Commission further suspended the two Supplements to January 1, 1975 (three months) in ac-

---

1. Act of May 28, 1937, P.L. 1053, *as amended*, 66 P.S. §1101 et seq.

**570**

cordance with the provisions of Section 308 of the Act.[2] Because the commission did not suspend Supplement No. 30, the higher rates set forth therein became effective, *by operation of law,* on April 1, 1974, and PEC collected the additional revenues under Supplement No. 30 after that date. On January 1, 1975, at the expiration of the

---

2. Section 308 of the Act, 66 P.S. §1148, reads as follows:

"(a) Unless the commission otherwise orders, no public utility shall make any change in any existing and duly established rate, except after sixty days' notice to the commission, which notice shall plainly state the changes proposed to be made in the rates then in force, and the time when the changed rates will go into effect. The public utility shall also give such notice of the proposed changes to other interested persons as the commission in its discretion may direct. All proposed changes shall be shown by filing new tariffs, or supplements to existing tariffs filed and in force at the time. The commission, for good cause shown, may allow changes in rates, without requiring the sixty days' notice, under such conditions as it may prescribe.

"(b) Whenever there is filed with the commission by any public utility any tariff stating a new rate, the commission may, either upon complaint or upon its own motion, upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate, and pending such hearing and the decision thereon, the commission, upon filing with such tariff and delivering to the public utility affected thereby a statement in writing of its reasons therefor, may, at any time before it becomes effective, suspend the operation of such rate for a period not longer than six months from the time such rate would otherwise become effective, and an additional period of not more than three months pending such decision. *The rate in force when the tariff stating the new rate was filed shall continue in force during the period of suspension, unless the commission shall establish a temporary rate as authorized in section three hundred ten of this act.* The commission shall consider the effect of such suspension in finally determining and prescribing the rates to be thereafter charged and collected by such public utility.

"(c) If, after such hearing, the commission finds any such rate to be unjust or unreasonable, or in anywise in vio-

statutory nine-month suspension, PEC began collecting the higher rates under Supplement No. 32. At no time did the Commission utilize the provisions of the Act providing for temporary rates.[3]

On June 26, 1974, the Commonwealth filed a "Complaint Against Collection Pursuant to Supplement 30 Filed by Philadelphia Electric Company." The complaint alleged that Supplement No. 30 became merged into Supplement No. 32 by virtue of the simultaneous filing, and that Supplement No. 30 should be interpreted as proposing a temporary rate increase pursuant to Section 310 of the Act.

On July 11, 1974, after over three months of hearings in which the Commonwealth had actively participated, PEC filed a motion to dismiss the complaints of the Commonwealth. In its final adjudication, the Commission denied PEC's motion to dismiss the Commonwealth's complaints, and concluded that out of a total proposed increase in the amount of $136,000,000, approximately $30,000,000 should be disallowed. In other words, the Commission concluded that PEC had justified increased rates far in excess of the rate provided for in Supplement No. 30. The Commission did order refunds to consumers of those amounts collected after January 1, 1975, in excess of those rates finally allowed by the adjudication.

### MOTION TO QUASH

PEC has presented a motion to quash the Commonwealth's appeal, based upon its assertion that the Attorney General, in the name of the Commonwealth, may

---

lation of law, the commission shall determine the just and reasonable rate to be charged or applied by the public utility for the service in question, and shall fix the same by order to be served upon the public utility; and such rate shall thereafter be observed until changed as provided by this act." (Emphasis added.)

3. *See* Section 310 of the Act, 66 P.S. §1150.

not file an appeal contesting an adjudication of the Commission. PEC contends that the decision in *York v. Public Utility Commission,* 3 Pa. Commonwealth Ct. 270, 281 A.2d 261 (1971), *aff'd.* 449 Pa. 136, 295 A.2d 825 (1972), prohibits the Commonwealth from filing a complaint with the Commission. We do not agree. *York, supra,* is distinguishable because in that case the Attorney General was not representing the Commonwealth as a consumer, and the Commonwealth was not a party to the proceeding at the hearing before the regulatory agency as a consumer. In this case, the Commonwealth was permitted by the Commission to file a complaint as a substantial consumer of electric service from PEC. Furthermore, PEC did not object to this intervention until after more than three months of hearings had been concluded. There is no merit to PEC's argument that the Commonwealth, *as a consumer,* was intended by the Legislature to be excluded from participating in public utility rate cases. The holding in *York, supra,* must be limited to the facts of that case. *York* stands for the proposition that the Commonwealth, acting solely as a representative of the general public, may not intervene in an appeal from a decision of the Commission pursuant to Section 1104 of the Act, 66 P.S. §1434. *York* does not stand for the proposition that the Commonwealth, *as a consumer* of public utility services, may not file a complaint pursuant to Section 1001 of the Act, 66 P.S. §1391. We specifically hold that the Commonwealth may protect its rights *as a consumer* by filing complaints pursuant to Section 1001 of the Act, and, as a party to the proceedings, may appeal to this Court pursuant to Section 1101 of the Act, 66 P.S. §1431. PEC's motion to quash is, therefore, denied.

## MULTIPLE RATE FILINGS

Our scope of review is limited to a determination of whether there was an error of law, a violation of con-

stitutional rights, or a lack of evidence to support the Commission's order. Section 1107 of the Act, 66 P.S. §1437.

The Commonwealth argues (1) that multistage tariff filings violate the spirit and policy of the Act and (2) that they violate that language taken from Section 308(b) which reads as follows:

"The rate in force when the tariff stating the new rate was filed shall continue in force during the period of suspension, unless the commission shall establish a temporary rate as authorized by section three hundred ten of this act [66 P.S. §1150]."

We do not agree that multistage tariff filings violate the spirit and policy of the Act. Although the Act does not expressly provide for such filings, it also does not contain an express prohibition of such filings. It may be argued that the Legislature did not contemplate such filings when it passed the Act; but it is also arguable that the Legislature did not contemplate either the current rate of inflation which makes rate increases so regrettably frequent, or the regulatory lag which inevitably delays the final determination of any contested rate increase.[4] The multistage tariff filing is a procedural technique, which has been adopted by utilities and permitted by the Commission, to avoid some of the problems caused by regulatory lag and the regrettable necessity for frequent rate relief. The multistage filing permits the Commission to allow a portion of the total increase to go into effect (subject to possible refund), while it suspends the higher stages of the total increase, pending the outcome of the investigation of the total increase, including the portion not suspended. This Court has considered and approved the procedure involved in multistage tariff

---

4. This Court receives many appeals involving utility rate increases and we note that almost every contested rate case consumes more than a year from time of filing until final determination by the Commission.

filings.[5] Such filings are a convenient procedural device which aids the Commission in its task of determining just and reasonable rates for utilities. If we were to accept the Commonwealth's position in this case, the inevitable effect would be to force utilities to file single-stage rate increases at even more frequent intervals and to force the Commission to fix temporary rates in more cases. Such a result would be detrimental to the interests of the utilities, the Commission, and the consumers, as will be explained hereinafter.

The Commonwealth argues that the one sentence of Section 308(b) of the Act prohibits multistage tariff filings. Although we do not agree, the argument does point out an apparent conflict in the Act, *i.e.*, how can one rate schedule become effective by operation of law, if another rate schedule is required to be continued in force?

In construing a statute which is not explicit, we are required to presume that the General Assembly intended the entire statute to be effective, and that the General Assembly did not intend a result which is absurd or unreasonable.[6]

A reading of the Act discloses the Legislature's recognition of some basic principles which we cannot ignore. The statute recognizes that a public utility, such as PEC, is a privately-owned rather than a publicly-owned entity. Because a public utility's business is "affected with a public interest," it is subject to government regulation, but the Act gives these privately-owned companies the right to establish or initiate changes in the rates they charge for the public service they render upon sixty days notice.[7] The Commission "may" suspend the effectiveness

5. *Baker v. Pennsylvania Public Utility Commission*, 14 Pa. Commonwealth Ct. 245, 322 A.2d 735 (1974).

6. Section 1922 (1) and (2) of the Statutory Construction Act, 1 Pa. C.S. §1922(1) and (2).

7. Sections 302 and 308 of the Act, 66 P.S. §§1142 and 1148.

of the rate filed for two periods, up to nine months. There is no mandatory provision in the Act that the Commission must suspend for any period; and even if it does suspend, it may lift the suspension before the end of the suspension period.[8] Clearly, the Legislature has provided that, if the Commission does not suspend, a rate filing becomes effective, *by operation of law*, at the end of the sixty-day period (or in even a lesser time if the Commission permits, according to Section 308).

In this case, because the Commission did not suspend Supplement No. 30, the increased rates of the supplement became effective, by operation of law, on April 1, 1974. This is so, not because of something the Commission or PEC did, but because the Legislature has so provided. When Supplement No. 30 became effective, it became the only rate schedule under which PEC could charge for its services, because Supplement No. 29 had been superseded by virtue of the statutory provisions. The Commonwealth would have us read out of context, and in isolation, the single sentence of Section 308 (b), noted above, and breathe life into Supplement No. 29 during the suspension of Supplements Nos. 31 and 32. To accomplish that result we would be forced to ignore the obvious legislative intent to make effective an unsuspended rate filing at the end of the sixty-day notice period. This we may not do. A literal reading of that one sentence in Section 308 (b) presents an apparent conflict.

To resolve this dilemma, to give effect to the entire Act (vis-a-vis one conflicting sentence read out of context), and to avoid an absurd or unreasonable result, we hold that the phrase "rate in force when the tariff stating the new rate was filed," found in the sentence in question, means the rate in effect at the time a rate filing is made, as it may be changed by operation of law.

---

8. *Pittsburgh v. Pennsylvania Public Utility Commission*, 178 Pa. Superior Ct. 368, 115 A.2d 858 (1955).

When we apply our holding to the facts of this case, we can discern the practical effect of Section 308. (1) If the Commission had determined that the rates provided in Supplement No. 30 were too high, the consumers would have been entitled to a refund back to April 1, 1974, because the rates were still under investigation. As it turned out, inasmuch as the Commission permitted PEC to collect the finally-determined rates only from January 1, 1975, the consumers paid $18,000,000 in increased rates (75% of $24,000,000) over the nine-month period of suspension; whereas the Commission, in its adjudication, decided that the company could justify $78,000,000 during that same nine-month period (75% of $105,000,000). In other words, PEC collected $60,000,000 less than the Commission found was justified for that nine-month suspension period. (2) The Commonwealth contends, however, under the single sentence theory that any increased rates during the suspension period could have been granted only under Section 310 of the Public Utility Law, 66 P.S. §1150. If the company or Commission had taken this course (which was available within the discretion of the Commission during the nine-month suspension period) and the temporary rates would have been set at the same level as those found in Supplement No. 30, the following pertinent provisions of Section 310 (e) would have come into play:

"If, upon the final disposition of the issues involved in such proceeding [the rate case], the rates as finally determined, are in excess of the rates prescribed in such temporary order, then such public utility *shall* be permitted to amortize and recover, by means of a temporary increase over and above the rates finally determined, such sum as shall represent the difference between the gross income obtained from the rates prescribed in such temporary order and the gross income which would have been obtained under the rates finally determined if applied during the

period such temporary order was in effect." (Emphasis added.)

Under the method followed by the Commission in this case, it was discretionary with the Commission whether PEC recovered the amount of money found to be justified for the suspension period in excess of the amount actually collected in that period. *See Pennsylvania Public Utility Commission v. Pennsylvania Gas & Water Company,* 19 Pa. Commonwealth Ct. 214, 341 A. 2d 239 (1975). If, however, the temporary rate approach was used (in which case it is conceivable that PEC would have been permitted to recoup $60,000,000 in addition to the increased revenues it did collect during the nine-month suspension period), the recoupment would have been mandatory. In other words, the procedures followed by the Commission in this case worked to the dollar advantage of the consumers insofar as the retroactive effect of the final determination is concerned.

Lastly the Commonwealth argues that Supplements No. 30, 31 and 32 merged into a single request for the rates set forth in Supplement No. 32. This argument has no merit. Each of the supplemental sheets to the tariff specifically stated that upon the effectiveness of the particular sheet, it superseded the prior-numbered sheet. There is no provision in the Act which would require the Commission to treat the multistage tariff filing as if it were a single-stage filing for the rates set forth in the highest stage.

In summary, we hold that where a public utility files multistage tariff supplements the Commission may suspend any or all of the supplements. There is no prohibition in the Public Utility Law against multistage tariff filings. Any filed supplement which is not suspended becomes effective, by operation of law, at the end of the notice period. When any supplement becomes effective, it supersedes the prior effective supplement, and the superseded supplement is no longer effective, by operation of

law. The rates collected by the public utility during suspension or under supplements which become effective by operation of law, and are under investigation, are subject to refund to the consumer or recoupment to the company as a matter of Commission discretion. Rates collected under a supplement which becomes effective by operation of law are not temporary rates. The consumers are protected from any unreasonable rate level by virtue of the refund provisions of the Act. In conclusion, we find no error of law committed by the Commission in permitting PEC to collect the higher rates contained in Supplement No. 30 during the suspension of Supplements Nos. 31 and 32.

In accordance with the above, we therefore

ORDER

AND NOW, this 5th day of March, 1976, the order of the Pennsylvania Public Utility Commission, entered April 8, 1975, in the above-captioned matter, is hereby affirmed.