City of Pittsburgh and Mayor Richard S. Caliguiri, Petitioners v. Pennsylvania Public Utility Commission, Respondent.

United States Steel Corporation, Intervenor.

Argued September 10, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., MENCER, BLATT, CRAIG, MACPHAIL and WILLIAMS, JR. Judge ROGERS did not participate.

*Marvin A. Fein,* Utilities Counsel, with him *Mead J. Mulvihill, Jr.,* City Solicitor, for petitioners, City of Pittsburgh and Mayor Richard S. Caliguiri.

*William T. Hawke,* Assistant Counsel, with him *Steven A. McClaren,* Deputy Chief Counsel, and *George M. Kashi,* Chief Counsel, for respondent, Pennsylvania Public Utility Commission.

*Henry M. Wick, Jr.,* with him *Charles J. Streiff,* for intervenor, United States Steel Corporation.

*Charles E. Thomas,* with him *Charles E. Thomas, Jr.,* and *Patricia Armstrong,* of counsel, *Thomas & Thomas,* for intervenor, Duquesne Light Company.

OPINION BY JUDGE MACPHAIL, December 8, 1980:

The City of Pittsburgh and Mayor Richard S. Caliguiri (Petitioners) have appealed from an order of the Pennsylvania Public Utility Commission (PUC) adopted September 28, 1978. The order granted an $81 million rate increase to Duquesne Light Company

(Duquesne) and denied the Petitioners a refund from a $60 million tariff which Duquesne was permitted to file effective during and subject to the investigation of a proposed $127.9 million rate increase. The Petitioners appeal only the denial of the refund.

This case originated on October 1, 1976 when Duquesne filed Tariff Supplement No. 2 with the PUC, proposing an annual rate increase of about $127.9 million, to become effective on November 30, 1976. Included in this rate increase was a request for "emergency rate relief" in the amount of $89 million. On October 20, 1976 Duquesne filed a petition with the PUC reducing its emergency relief request to $87 million. In an "Investigation and Suspension Order" adopted without a hearing December 9, 1976 and entered on December 17, 1976 the PUC suspended the tariff supplement for $127.9 million (December 9, 1976 order). In addition to suspending the tariff supplement the order instituted an investigation including consideration of temporary rates under Sections 308 (b) and 310 of the Public Utility Law (Law).[1] In the preamble to the order, the PUC stated that pending the inquiry, investigation and further order of the PUC, Duquesne "may file a tariff supplement designed to produce an increase not to exceed $60 million, provided, however, that the rates . . . shall not be deemed commission made rates. . . ." The PUC further stated that the rates may be effective within one day of filing and shall be subject to the *same inquiry and investigation.*

Duquesne filed such a tariff supplement on December 13, 1976. The Petitioners, among others, protested the $60 million emergency increase and the PUC referred the matter to an Administrative Law Judge

---

[1] Act of May 28, 1937, P.L. 1053, *as amended,* 66 P.S. §§1148(b) and 1150, now codified in 66 Pa. C. S. §§1308(b) and 1310.

(ALJ) who, after conducting extensive hearings, filed a report and proposed decision upholding the emergency relief of $60 million. In an order adopted June 28, 1977 and entered July 6, 1977 (June 28, 1977 order) the PUC directed Duquesne to reduce its rates effective July 9, 1976 to a level which would produce additional gross revenues of $12 million annually. Duquesne filed a petition for review and an Application for Stay or Supersedeas of the June 28, 1977 order with this Court. The Petitioners, among others, filed cross-Petitions for Review of both the December 9, 1976 and June 28, 1977 orders. The stay was denied by this Court in *Duquesne Light Co. v. Pennsylvania Public Utility Commission*, 31 Pa. Commonwealth Ct. 118, 375 A.2d 399 (1977). The Petition for Review was dismissed by this Court in *Duquesne Light Co. v. Pennsylvania Public Utility Commission*, 34 Pa. Commonwealth Ct. 50, 382 A.2d 991 (1978) on the grounds that the rate case for $127.9 million was still being litigated and that both the orders of December 9, 1976 and June 28, 1977 were interlocutory orders.

Temporary rates at the then current level were set by the PUC in an order adopted August 30, 1977 and entered September 15, 1977. The PUC, in an interim order adopted December 20, 1977 and entered December 22, 1977, amended the temporary rate order of August 30, 1977 to permit Duquesne to file a tariff supplement to collect additional revenues of $44 million if it chose recoupment or $50 million if recoupment was waived.[2] Duquesne filed the latter supplement. Peti-

---

[2] Section 1150(e) of the Law, 66 P.S. §1150(e) provides:

Temporary rates so fixed, determined, and prescribed under this section shall be effective until the final determination of the rate proceeding, unless terminated sooner by the commission. In every proceeding in which temporary rates are fixed, determined, and prescribed under this section, the commission shall consider the effect of such rates

tioners filed a complaint with the PUC requesting refund in the amount of $35 million collected by Duquesne pursuant to the $60 million tariff supplement filed by Duquesne on December 13, 1976. Evidentiary hearings on the initial $127.9 million rate increase and all other issues were held. The PUC in a short form order adopted September 28, 1978 and entered in long form on February 5, 1979, granted Duquesne an increase of $81 million with recoupment or a $90 million increase if recoupment was waived. Duquesne chose to file the former tariff reflecting an $81 million increase. The Petitioners' request for refund of $35 million was denied.

The Petitioners assert that the PUC erred by failing to order Duquesne to refund the $35 million. The Petitioners argue that since the PUC had no statutory

in fixing, determining, and prescribing rates to be thereafter demanded or received by such public utility on final determination of the rate proceeding. If upon final disposition of the issues involved in such proceeding, the rates as finally determined, are in excess of the rates prescribed in such temporary order, then such public utility shall be permitted to amortize and recover, by means of a temporary increase over and above the rates finally determined, such sum as shall represent the difference between the gross income obtained from the rates prescribed in such temporary order and the gross income which would have been obtained under the rates finally determined if applied during the period such temporary order was in effect.

This Section was codified by Section 1 of the Act of July 1, 1978, P.L. 598, 66 Pa. C. S. §1310(e) and now provides as follows:

Effect and adjustment of rates.—Temporary rates so fixed, determined, and prescribed under this section shall be effective until the final determination of the rate proceeding, unless terminated sooner by the commission. In every proceeding in which temporary rates are fixed, determined, and prescribed under this section, the commission shall consider the effect of such rates in fixing, determining, and prescribing rates to be thereafter demanded or received by such public utility on final determination of the rate proceeding.

authority to supend a tariff and then grant a partial rate increase prior to holding hearings, refunds should be ordered. Petitioners further argue that Duquesne customers were denied their right to due process because the rate increase was granted without holding hearings.

At the time this highly contested rate case began, there was no provision in the Law for emergency rate relief. The Law has since been amended.[3] The question of the legality of the procedure employed by the PUC in its December 9, 1976 order was not an issue in the prior proceedings before this Court.

While we agree with the Petitioners that there is no statutory provision expressly authorizing the exact procedure utilized by the PUC, we do not agree that the rates were therefore illegal and that a refund must be ordered. This Court in *City of Erie v. Pennsylvania Electric Company,* 34 Pa. Commonwealth Ct. 326, 383 A.2d 575 (1978) permitted the PUC to allow utilities throughout the Commonwealth to adjust their rates to reflect a tax surcharge on their customers without first having the PUC grant individual rate requests from each utility. This Court recognized in that case that the powers of the PUC are limited to those expressly granted by the Law *or which arise by necessary implication therefrom.* The Court further held that reasonable adjustments in utility rates without prior hearing may be implied from the PUC's duty to ensure that rates remain "just and reasonable."[4] Thus, although

---

[3] Act of October 7, 1976, P.L. 1057, effective October 7, 1977 now codified in 66 Pa. C. S. §1308(e).

[4] This Court in *City of Erie, supra,* relied on Section 308(a) of the Law, 66 P.S. §1148(a), which provides in pertinent part:

Unless the commission otherwise orders, no public utility shall make any change in any existing and duly established rate, except after sixty days' notice to the commission. . . . *The commission, for good cause shown, may allow*

the PUC must not ignore the customer's rights, it also has a duty to consider other factors in protecting the right of a public utility to receive a fair return on its investment. In the instant case, Duquesne's primary concerns in its request for emergency relief were its inability to provide adequate interest coverage for new bonds, its inability to maintain an AA rating for its bonds and problems with the issuance of preferred stock. All of these concerns indicated that an immediate adjustment in utility rates was required in order that those rates might remain "just and reasonable." We conclude that the PUC had the implied power to proceed as it did.

In the preamble to its December 9, 1976 order the PUC stated that a $127.9 million rate increase might be unjust and unreasonable and therefore suspended the tariff. In that preamble the PUC also permitted but did not order Duquesne to file a $60 million tariff supplement for immediate relief. The December 9, 1976 order did not use the words "emergency rate relief." In assigning the matter of the $60 million increase to an ALJ on December 16, 1976, however, the PUC did recognize the immediate need to conduct hearings on that portion of the petition designated by Duquesne as an application for emergency rate relief.

This Court in *Public Utility Commission v. Commonwealth*, 23 Pa. Commonwealth Ct. 566, 353 A.2d 887 (1976) (*Commonwealth*) recognized the practice

---

changes in rates, without requiring the sixty days' notice under such conditions as it may prescribe. (Emphasis added.)

This Court has also relied on *City of Erie* in *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 42 Pa. Commonwealth Ct. 242, 400 A.2d 672 (1979) to support the filing of a tariff effective on one day's notice for an "emergency surcharge" when the PUC was already considering a request for an increase in the utility's rate base.

of filing multiple tariffs, some of which the PUC might allow to become effective while suspending and investigating others. Duquesne, however, filed only one tariff supplement which included divisible rate increases. To deny Duquesne the right to its rate increase solely on the basis of whether one or two pieces of paper were filed would lead to an absurd result.

It is well settled that the PUC without notice or hearing may permit rates to become effective or suspend them pending decision concerning their lawfulness. *Baker v. Pennsylvania Public Utility Commission*, 14 Pa. Commonwealth Ct. 245, 322 A.2d 735 (1974). The reason that no hearing is required on the initial question of the suspension is that the failure to suspend does not amount to commission approval and refunds are available if the increase is later held to be unjustified.[5] *Commonwealth, supra.* Of course, if the

---

[5] Section 313(a) of the Law, 66 P.S. §1153(a), provides in pertinent part as follows:

If, in any proceeding involving rates, the commission shall determine that any rate received by a public utility was unjust or unreasonable, or was in violation of any regulation or order of the commission, or was in excess of the applicable rate contained in an existing and effective tariff of such public utility, the commission shall have the power and authority to make an order requiring the public utility to refund the amount of any excess paid by any patron, in consequence of such unlawful collection, within two years prior to the date of the filing of the complaint, together with interest at the legal rate from the date of each such excessive payment. In making a determination under this section, the commission need not find that the rate complained of was extortionate or oppressive. Any order of the commission awarding a refund shall be made for and on behalf of all patrons subject to the same rate of the public utility. The commission shall state in any refund order the exact amount to be paid, the reasonable time within which payment shall be made, and shall make findings upon pertinent questions of fact.

rates are suspended, the consumer does not have to pay them. Thus, in either case, the rights of the consumers are protected.

The PUC's authority to suspend or not suspend a rate increase pending investigation is within the sound discretion of the PUC. *City of Philadelphia v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 96, 63 A.2d 391 (1949). Since the PUC has this discretionary power, it could, in the instant case, by the process of granting and lifting the suspension of the $127.9 million rate increase at appropriate times, accomplish what it did by its actions on December 9, 1976. The Law requires tariffs to be *filed* for all rates charged; therefore, the PUC could not, on its own order, merely reduce the dollar amount of the proposed tariff. To hold that the PUC could accomplish the same result by manipulation but not by a direct method again would produce an absurd result.

In addition, even if we were to hold that the PUC committed an error of law, the error in this case would be harmless. We fail to see how the Petitioners have been injured because of a $60 million rate increase subject to refunds when the PUC could have granted the complete $127.9 million increase also subject to refunds if the rate was found to be unreasonable. The rights of the customers have been protected at all times during the litigation of this rate case.

Petitioners' argument that Duquesne customers were denied due process has absolutely no merit. This Court considered a similar due process argument in *Baker, supra.* The *Baker* Court relied on *Holt v. Yonce,* 370 F. Supp. 374 (D.S.C. 1973), *aff'd per curiam* 415 U.S. 969 (1974) for the proposition that

When this Section was codified by Section 1 of the Act of July 1, 1978, P.L. 598, 66 Pa. C. S. §1312(a), the time limitation for refunds was increased from two years to four years.

due process rights are not violated by the granting of interim rate relief without hearings, pending final disposition after hearings. Duquesne customers were clearly protected by the availability of refunds should the rates ultimately have been deemed unjust or unreasonable. The customers' rights were given due consideration. The PUC directed the ALJ in charge of the rate case to take evidence immediately on the merits of granting the emergency rate relief. After twelve days of hearings, submission of briefs and oral argument, the ALJ concluded that Duquesne had sustained its burden of establishing the need for emergency relief. The Petitioners were among the numerous complainants who testified at those hearings. Their due process rights were thus recognized and, indeed, exercised.

For the reasons set forth above, we affirm the September 28, 1978 order of the PUC denying a refund of $35 million to the Petitioners.

ORDER

AND Now, this 8th day of December, 1980, the order of the Pennsylvania Public Utility Commission adopted September 28, 1978 denying the City of Pittsburgh and Mayor Richard S. Caliguiri a request for refund from a rate increase is hereby affirmed.