459 A.2d 1218

**ALLEGHENY LUDLUM STEEL CORPORATION, Appellant,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION and West Penn Power Company, Appellees.**

Supreme Court of Pennsylvania.

Argued March 8, 1983.

Decided May 4, 1983.

Leonard J. Marsico, Stephen A. George, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, P.C., Pittsburgh, for appellant.

Charles F. Hoffman, Chief Counsel, Daniel P. Delaney, Deputy Chief Counsel, James P. Melia, Asst. Counsel, Harrisburg, for appellees.

Drew J. Kovalak, Greensburg, for intervenor.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This is an appeal from an order of the Commonwealth Court[1] which upheld the constitutionality of a public-utility rate-setting procedure employed by the Pennsylvania Public Utility Commission (PUC), appellee, in reviewing an increase in electric rates sought by West Penn Power Company (West Penn), appellee. The appellant, Allegheny Ludlum Steel Corporation (Allegheny Ludlum), a large industrial customer of West Penn, challenges, on procedural due process grounds, the statutory and regulatory framework under which the PUC approved an increase in West Penn's rates.

On November 20, 1981, West Penn applied to the PUC for an increase in its 1982 electric rates pursuant to Section 1307 of the Public Utility Code.[2] Section 1307(c) provides for

---

1. *Allegheny Ludlum Steel Corp. v. Pa. Public Utility Commission,* 67 Pa.Commw. 400, 447 A.2d 675 (1982).

2. Public Utility Code, Act of July 1, 1978, P.L. 598, No. 116, § 1, 66 Pa.C.S.A. § 1307 (1979), which provides:

   **(a) General rule.**—Any public utility, except a common carrier, may establish a sliding scale of rates or such other method for the

automatic adjustment of rates, in a manner prescribed by the PUC, to reflect fuel cost increases. Accordingly, the

automatic adjustment of the rates of the public utility as shall provide a just and reasonable return on the fair value of the property used and useful in the public service, to be determined upon such equitable or reasonable basis as shall provide such fair return. A tariff showing the scale of rates under such arrangement shall first be filed with the commission, and such tariff, and each rate set out therein, approved by it. The commission may revoke its approval at any time and fix other rates for any such public utility if, after notice and hearing, the commission finds the existing rates unjust or unreasonable.

(b) **Mandatory system for automatic adjustment.**—The commission, by regulation or order, upon reasonable notice and after hearing, may prescribe for any class of public utilities, except a common carrier, a mandatory system for the automatic adjustment of their rates, by means of a sliding scale of rates or other method, on the same basis as provided in subsection (a), to become effective when and in the manner prescribed in such regulation or order. Every such public utility shall, within such time as shall be prescribed by the commission, file tariffs showing the rates established in accordance with such regulation or order.

(c) **Fuel cost adjustment.**—In any method automatically adjusting rates to reflect changes in fossil fuel cost under this section, the fuel cost used in computing the adjustment shall be limited, in the case of an electric utility, to the cost of such fuel delivered to the utility at the generating site at which it is to be consumed, and the cost of disposing of solid waste from scrubbers or other devices designed so that the consumption of Pennsylvania-mined coal at the generating site would comply with the sulfur oxide emission standards prescribed by the Commonwealth. The cost of fuel handling after such delivery, or of waste disposal, other than as prescribed in this section, shall be excluded from such computation. In any method automatically adjusting rates to reflect changes in fuel cost other than fossil fuel cost under this section, the fuel cost used in computing the adjustment shall be limited, in the case of an electric utility, to the cost of such fuel delivered to the utility at the generating site at which it is to be consumed after deducting therefrom the present salvage or reuse value of such fuel, as shall be established by commission rule or order.

(d) **Fuel cost adjustment audits.**—The commission shall conduct or cause to be conducted, at such times as it may order, but at least annually, an audit of each public utility which, by any method described in this section, automatically adjusts its rates to reflect changes in its fuel costs, which audit shall enable the commission to determine the propriety and correctness of amounts billed and collected under this section. Whoever performs the audit shall be a person knowledgable in the subject matter encompassed within the operation of the automatic adjustment clause. The auditors report shall be in a form and manner directed by the commission.

PUC has adopted the Energy Cost Rate (ECR)[3] formula to govern automatic adjustment of rates. Allegheny Ludlum

**(e) Automatic adjustment reports and proceedings.—**

(1) Within 30 days following the end of such 12-month period as the commission shall designate, each public utility using an automatic adjustment clause shall file with the commission a statement which shall specify for such period:

(i) the total revenues received pursuant to the automatic adjustment clause;

(ii) the total amount of that expense or class of expenses incurred which is the basis of the automatic adjustment clause; and

(iii) the difference between the amounts specified by sub-paragraphs (i) and (ii).

Such report shall be a matter of public record and copies thereof shall be made available to any person upon request to the commission.

(2) Within 60 days following the submission of such report by a public utility, the commission shall hold a public hearing on the substance of the report and any matters pertaining to the use by such public utility of such automatic adjustment clause in the preceding period and may include the present and subsequent periods.

(3) Absent good reason being shown to the contrary, the commission shall, within 60 days following such hearing, by order direct each such public utility to, over an appropriate 12-month period, refund to its patrons an amount equal to that by which its revenues received pursuant to such automatic adjustment clause exceeded the amount of such expense or class of expenses, or recover from its patrons an amount equal to that by which such expense or class of expenses exceeded the revenues received pursuant to such automatic adjustment clause.

(4) For the purpose of this subsection, where a 12-month report period and 12-month refund or recovery period shall have been previously established or designated, nothing in this section shall impair the continued use of such previously established or designated periods nor shall anything in this section prevent the commission from amending at any time any method used by any utility in automatically adjusting its rates, so as to provide the commission more adequate supervision of the administration by a utility of such method and to decrease the likelihood of collection by a utility, in subsequent periods, of amounts greater or less than that to which it is entitled, or, in the event that such deficiency or surplus in collected amounts is found, more prompt readjustment thereof.

**3.** The purpose of the ECR is to provide an automatic mechanism enabling utilities to recover specific energy costs not covered by general rates, by allowing collection of rates based on projected cost data for the calendar year. "[T]he ECR is calculated by dividing the projected, applicable energy costs by the projected total system kilowatt hour sales, subtracting from this quotient the energy base rate and adjusting this remainder for prior period's energy costs over or under recovered." PUC—Bureau of Audits ECR Procedure. The ECR determines, therefore, the amount per kilowatt hour which the

filed an objection to the proposed increase, yet on December 18, 1981 the PUC approved the increase, effective January 1, 1982. The meeting at which approval was granted was open to the public, but, although Allegheny Ludlum was provided notice of the proceeding by West Penn, the PUC denied Allegheny Ludlum an opportunity to be heard, in accordance with its policy of allowing the public to observe but not participate in such proceedings.

Allegheny Ludlum contends that, as a constitutional prerequisite to allowance of the rate increase, the PUC had a duty to provide advance notice, access to supplemental data, an opportunity to be heard, and a determination on the record. Specifically, it is asserted that the decisions of this Court in *Conestoga National Bank of Lancaster v. Patterson,* 442 Pa. 289, 275 A.2d 6 (1971) and *Pennsylvania Coal Mining Assn. v. Insurance Department,* 471 Pa. 437, 370 A.2d 685 (1977) require nullification of the instant agency action on procedural due process grounds. We disagree.

■ In *Conestoga,* where approval by the Department of Banking of an application for the establishment of a branch bank was held to be a judicial determination involving substantial property rights of the applicant, as well as of protesting banks and the surrounding financial community, the Court set forth the applicable principle of procedural due process as follows: "Procedural due process does not require notice and a hearing in every conceivable situation involving administrative action. (Citation omitted.) However, these

customer pays in addition to the base rate. Undercollections and overcollections of realized energy costs are reconciled annually. 66 Pa.C.S.A. § 1307(e), n. 2 *supra.* Undercollections are recovered from customers in the subsequent billing year without liability for interest. However, it is the practice to refund overcollections with interest, the interest rate being computed monthly in accordance with the variable rate set forth in the Public Utility Code, 66 Pa.C.S.A. § 1308(d), which pertains to general rate changes as opposed to automatic rate adjustments. In pertinent part, this section provides the rate "shall be the average rate of interest specified for residential mortgage lending by the Secretary of Banking in accordance with the Act of January 30, 1974 (P.L. 13, No. 6), referred to as the Loan Interest and Protection Law [41 P.S. § 101 et seq.], during the period or periods for which the commission orders refunds." This rate averaged 14.73% for the twelve month period ending October 31, 1981.

procedural safeguards should accompany a situation where the administrative action is adjudicatory in nature and involves substantial property rights." 442 Pa. at 296, 275 A.2d at 9. Actions are adjudicatory in character when they culminate in a final determination affecting personal or property rights. See *Id.*, 442 Pa. at 298, 275 A.2d at 11. In the present case, Allegheny Ludlum has incurred substantial increases, of approximately $10,000 per day, in rates paid to West Penn. Safeguards are, however, afforded through a subsequent, year-end, automatic proceeding for final determination and adjustment of rate increases allowing full participation by all interested parties, and requiring refunds, with interest, calculated at the prevailing rate,[4] of overpayments in the event previous ECR increases are determined to have been excessive. See Section 1307(e), n. 2 *supra;* n. 3 *supra.* These are factors of significance to the procedural due process inquiry. See *Pennsylvania Coal,* 471 Pa. at 454, 370 A.2d at 694. In contrast, the process held unconstitutional by this Court in *Conestoga* afforded the protesting banks no opportunity to be heard, either prior or subsequent to the challenged administrative determination, and the determination was not merely provisional, but final.

A preference has been recognized for procedural protections effective prior to governmental action that threatens to deprive citizens of their interests, unless important governmental interests, or the preservation of others' interests, require otherwise. *Pennsylvania Coal,* 471 Pa. at 451, 370 A.2d at 692. The need for a public utility to receive a fair rate of return on its property to assure its continued financial integrity, necessary to achievement of the important goal of preserving modern, efficient, and dependable public service, consonant with rights of customers, is not to be ignored. The legislature, seeking to balance these competing interests, has authorized the PUC to employ an automatic fuel cost adjustment, the ECR, to maintain a just and reasonable return. In so doing, the legislature has not conferred broad discretion upon the PUC; rather, Section

4. See n. 3, *supra.*

1307(c) specifically sets forth factors to govern the fuel cost adjustment employed by the PUC. See n. 2, *supra.* Hence, the instant case is not comparable to that of *Pennsylvania Coal,* where the administrative agency acted without the equivalent of a legislatively guided formula governing rate increases.

In *Pennsylvania Coal,* this Court held that coal mining companies, required to carry insurance providing for black lung disease benefits, had an interest in insurance rate-setting proceedings that was entitled to the protection of due process. Under the applicable regulatory scheme, a private organization composed of insurance carriers offering black lung coverage proposed rates, which, after a waiting period of thirty days, were "deemed" approved unless disapproved or modified by the Insurance Commissioner. In holding that coal mining companies were entitled to notice of the proposed rates and an opportunity to present views, in writing, as to reasons the rates should not be deemed into effect, the Court stated that procedural due process protections were to be afforded the coal companies because of the "private" nature of the rate-setting process:

> Where proposals by a private party must be reviewed and approved by a regulatory agency before they become effective, there is no unconstitutional delegation. The possibility of an arbitrary disregard of individual interests when the recommendations of a private body are deemed into effect without the specific approval of a public official, however, *demands greater procedural protection than due process might otherwise require.*

471 Pa. at 451, 370 A.2d at 692 (emphasis added). In the instant case, the challenged rate-setting scheme lacks the "private" character of that held unconstitutional in *Pennsylvania Coal;* indeed, the PUC must expressly approve ECR increases sought by West Penn.

We reject, therefore, the contention of Allegheny Ludlum that the decisions of this Court in *Conestoga* and *Pennsylvania Coal* mandate nullification of the rate-setting procedure in question. In view of the interest of West Penn to be

protected, the automatic year-end final determination of rates through which excessive rates paid can be recovered with interest, calculated at the prevailing rate, the notice and full opportunity to be heard accompanying that determination, the specific guidelines restricting the PUC's formulation of the ECR formula, and the absence of a rate-setting process that could be characterized as "deeming" the proposals of "private" interests into effect, we find the instant rate-setting process not to be violative of procedural due process.

Affirmed.

LARSEN, J., files a dissenting opinion in which McDERMOTT, J., joins.

LARSEN, Justice, dissenting.

"Procedural fairness and regularity are of the indispensable essence of liberty." *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 224, 73 S.Ct. 625, 635, 97 L.Ed. 956 (1963). "It is procedure that spells much of the difference between rule by law and rule by whim or caprice." *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 179, 71 S.Ct. 624, 652, 95 L.Ed. 817 (1951). I believe that the due process clause is not as flimsy an article as is suggested by the majority and would find the procedures employed by the Pennsylvania Public Utility Commission (PUC) for automatically "adjusting" electric rates[1] to be fundamentally deficient in safeguarding the right of an electric utility's customers to be free from deprivation of property without due process of law.

In the instant case, Allegheny Ludlum, appellant, has been deprived of approximately $3.5 million for at least one year by a determination of the PUC rendered in what was, essentially, an *ex parte proceeding* that did not afford appellant an opportunity to present objections in any form, either written or oral. Obviously, the PUC determination

---

1. Pursuant to section 1307(c) of the Public Utility Code, 66 Pa.C.S.A. § 1307(c) and the PUC's Energy Cost Rate formula.

was made *solely* on the basis of the information contained in the papers filed by West Penn Power Company wherein West Penn proposed to increase its rates by some $75 million,[2] although we are *informed* by the PUC that West Penn's proposal was checked for accuracy by the PUC's Bureau of Audits which prepared an *internal* report which was, we are further *informed,* reviewed by the Commissioners before they granted West Penn's increase *in full.* Of course, in the absence of an on-the-record determination and/or written opinion, it is impossible for this Court to verify the accuracy of this information.

Such a procedure, it seems to me, smacks of the potential for the sort of arbitrariness against which the due process clause protects. Indeed, it "has long been recognized that 'fairness can rarely be obtained by secret, one-sided determinations of facts decisive of rights. . . .' " *Fuentes v. Shevin,* 407 U.S. 67, 81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972), *quoting Joint-Anti Fascist Refugee Committee v. McGrath, supra,* 341 U.S. at 170, 71 S.Ct. at 647. Certainly, this case involves an adjudicatory determination of facts decisive to the need for a rate increase, as is candidly admitted by the PUC. ("The Commission concurs with appellant's characterization of its ECR proceedings as being adjudicatory in nature where approval of West Penn's 1982 ECR affects a specific rate increase directed toward a specific geographic area." Brief for appellee PUC at 49–50.) This one-sided determination based upon an *internal* (*i.e.,* unavailable to West Penn's customers) report violates "well-settled principles governing the proceedings of rate-making commissions." *Railroad Commission v. Pacific Gas & Electric Co.,* 302 U.S. 388, 393, 58 S.Ct. 334, 337, 82 L.Ed. 319 (1938). In *Pacific Gas & Electric Co., supra* at 394, 58 S.Ct. at 338, the United States Supreme Court enunciated these "well-settled principles":

2. In contrast, in West Penn's preceding general rate increase case, PUC Docket No. R–80021082, the PUC granted a rate increase of some $47.4 million after nine months of investigation, public hearings and consideration of evidentiary data filed by both the utility and its customers.

The right to a fair and open hearing is one of the rudiments of fair play assured to every litigant by the Federal Constitution as a minimal requirement. (citations omitted) There must be due notice and an opportunity to be heard, the procedure must be consistent with the essentials of a fair trial, and the Commission must act upon evidence and not arbitrarily. (citations omitted).

Of course, the "essentials of a fair trial" need not include a full-blown evidentiary hearing with opportunity to examine and cross-examine witnesses and present oral argument. Due process is undoubtedly a flexible concept calling for such procedural protections as the particular situation, and the particular deprivation, demands. *Pennsylvania Coal Mining Association v. Insurance Department,* 471 Pa. 437, 449, 370 A.2d 685 (1977), *quoting Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

However, the flexibility of due process enters into the calculation of "what process is due?", *not whether any process is due* prior to a deprivation of a protected interest. *See, e.g., Pennsylvania Coal, supra, Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) *and* K.C. Davis, Administrative Law Treatise (Second Ed.), Chapter 13, Fair Informal Procedure (1979). The general rule is that, *ordinarily,* due process of law requires, *prior* to deprivation of protected interests, "some kind of a hearing" with opportunity for affected parties to be heard. *Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 19, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978); *Hodel v. Virginia Surface Mining & Reclamation Association,* 452 U.S. 264, 299, 101 S.Ct. 2352, 2371, 69 L.Ed.2d 1 (1981). Only in "extraordinary" circumstances, *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971), and/or "emergency situations", *Hodel, supra* 452 U.S. at 300, 101 S.Ct. at 2372, has the United States Supreme Court sanctioned the deprivation of rights without some prior procedural protections. These extraordinary and/or emergency situations must be "truly unusual". *Fuentes v. Shevin, supra* 407 U.S. at 90–91, 92 S.Ct. at 1999. *See, e.g., Hodel, supra* 452 U.S. at 299–303,

101 S.Ct. at 2371–2374. Neither West Penn nor the PUC suggest that there is an extraordinary or emergency aspect to the rate increase situation presented herein. Indeed, the automatic "adjustment" is a normal, *routine* PUC procedure. This Court must not countenance such *routine disregard* for the utility customers' constitutional guarantees of due process.

The failure of the majority to require "some process" prior to the deprivation of appellant's substantial property interests can be traced to the mistaken notion that the constitution recognizes merely a "preference ... for procedural protections effective prior to governmental action that threatens to deprive citizens of their interests. . . ." At 1221. Operating under that erroneous impression, the majority then is lulled into a relaxed state of vigilance by the existence of *subsequent* PUC proceedings in "adjustment" cases and the provisions for refunds in the case of excessive rates. Most emphatically, I must stress that prior procedural protections are *not* simply a "preference"—rather, prior procedural protections of some form are an *essential constitutional prerequisite* to governmental deprivation of protected interests, subject only to the extraordinary and emergency situation exceptions noted previously, which are not present in this case.

In *Fuentes v. Shevin, supra,* 407 U.S. at 80–82, 92 S.Ct. at 1994–1995, the United States Supreme Court set forth several pertinent principles which (should) govern our decision today:

> For more than a century the central meaning of procedural due process has been clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." (citations omitted) It is equally fundamental that the right to notice and an opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." (citation omitted)
>
> . . . .

The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property, a danger that is especially great when the State seizes goods simply upon the application of and for the benefit of a private party.

. . . .

If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly taken in the first place. Damages may even be awarded to him for the wrongful deprivation. But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred. "This Court has not . . . embraced the general proposition that a wrong may be done if it can be undone." (citation omitted).

This is no new principle of constitutional law. The right to a prior hearing has long been recognized by this Court under the Fourteenth and Fifth Amendments. Although the Court has held that due process tolerates variances in the *form* of a hearing "appropriate to the nature of the case," (citation omitted) and "depending upon the importance of the interests involved and the nature of the subsequent proceedings [if any]," (citation omitted), *the Court has traditionally insisted that, whatever its form, opportunity for that hearing must be provided before the deprivation at issue takes effect.* (emphasis added).

For the foregoing reasons, I would hold that the PUC "adjustment" procedures under section 1307, § 66 Pa.C.S.A.

§ 1307, are constitutionally infirm. I would further hold that, under the circumstances of this case, minimum due process requires the procedures (and protections) urged upon this Court by appellants, namely advance notice, access to supporting data, an opportunity to be heard at least by way of written objections, and a determination on the record which responds to those objections. Such informal procedures need not be elaborate and need not be unduly time-consuming. The time-frame of the instant case—six weeks from filing proposed increase until effective date of increase—proved more than adequate time to accommodate these minimum procedural requirements. As Professor K.C. Davis has stated, Administrative Law Treatise, *supra,* § 10:1, "balancing to guide the choice between Goss procedure [the author's term, from *Goss v. Lopez, supra,* for fair informal administrative procedure] and no procedural protection for a party almost always leads to a choice of Goss procedure because the cost to the government of providing a summary of evidence and receiving a written or oral response [from adversely affected parties] is so slight."

McDERMOTT, J., joins in this dissenting opinion.