National Fuel Gas Distribution Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued September 13, 1983, before President Judge CRUMLISH, JR. and Judges ROGERS, WILLIAMS, JR., CRAIG, MACPHAIL, DOYLE and BARRY.

*Michael W. Gang,* with him *W. Russel Hoerner* and *Anthony C. DeCusatis, Morgan, Lewis & Bockius,* for petitioner.

*Gary D. Cohen,* Assistant Counsel, with him *Albert W. Johnson, III,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Philip F. McClelland,* Assistant Consumer Advocate, with him *Walter W. Cohen,* Consumer Advocate, for intervenor, Office of Consumer Advocate.

OPINION BY JUDGE ROGERS, March 26, 1984:

In these consolidated cases, the National Fuel Gas Distribution Corporation (NFG) seeks review of orders of the Pennsylvania Public Utility Commission (Commission)[1] the joint effect of which was to require refunds to customers of $3,245,727.00 said to represent "the interest accrued" to NFG on certain gas cost rate revenues determined by the Commission to have been unlawfully collected. The matters in controversy are the most recent to be born of the decision of the Commission in 1979 and 1980 to investigate and ultimately to disapprove purchases by NFG of synthetic natural gas (SNG) pursuant to a ten year contract with Ashland Oil Company, an unregulated petroleum refiner, which produced the SNG from liquid petroleum feedstocks at Ashland's Tonawanda, New York refinery. We recently considered a number of questions raised with respect to the Commission's orders entered August 28, 1980 and September 4, 1980 requiring NFG to refund to its customers $13,886,062 representing costs associated with the disapproved SNG purchases. *National Fuel Gas Distribution Corporation v. Pennsylvania Public Utility Commission*, Pa. Commonwealth Ct. , 464 A.2d 546 (1983). We there held that the Commission had failed adequately to describe in its adjudication the legal and factual basis for its refund requirement and we remitted the record to that body for further proceedings.

In the opinion filed in support of our order just described we explored in detail the circumstances which led to NFG contract for a supply of SNG and which later led the Commission to condemn the

---

[1] The first order was entered October 4, 1982 and the second was entered December 3, 1982; both orders were docketed to C-812654.

maintenance of that supply. No purpose would now be served by repeating that history; it will suffice at this time to note that NFG's contract with Ashland Oil contains a provision the effect of which is to permit NFG to pay $.50 per MCF[2] as a penalty for gas produced by Ashland Oil under the contract but not taken by NFG for delivery and resale to its customers. In the context of the 1980 orders described above, the Commission held that NFG ought to have invoked the operation as this "take-or-pay" provision as, in 1978 and 1979, the cost of SNG rose to more than $6.00 per MCF, a figure upwards of twice the then prevailing price of natural gas. As we will shortly discuss at length, the cost to NFG of the gas it supplies to its customers is recovered in the form of gas cost rate (GCR) charges made a part of each customer's monthly bill. The gas cost rate charges, in turn, reflect a cost of anticipated gas purchases determined by the utility in accordance with a computational formula first promulgated by the Commission in 1978 and applicable to GCR filings made annually by NFG as one of the Commonwealth's Class-A gas utilities. Thus, GCR-1, for which each gas utility made application in July, 1978, governed the recovery from customers of the cost of gas supplied during the period from September, 1978 through August, 1979.

On July 31, 1981,[3] NFG filed with the Commission its calculations applicable to the GCR-4 period to commence on September 1, 1981. Specifically, NFG sought to establish by the filing a gas cost rate of $.2984 per MCF[4] based, *inter alia,* on the utility's pro-

---

[2] MCF is a unit of volumetric measure representing one thousand cubic feet of gas.

[3] This filing was revised on August 14, 1981, for reasons that are not here pertinent.

[4] Reduced in the August 14, 1981 revised filing to $.2327.

152

jected cost of gas from its suppliers (from which Ashland SNG had been excluded in conformance with the Commission's order eleven months earlier, but including the $.50 per MCF penalty attendant to a discontinuance of the Ashland source of supply); the amount of projected purchases and sales to customers; and certain overcollections from the GCR-3 period to be refunded to customers together with interest; each of which quantity and cost was incorporated into the computational formula mandated by the Commission in 1978 to yield the gas cost rate. The increase was intended to become effective on September 1, 1981, the first day of GCR-4.

On August 28, 1981, the four members of the Commission as it was then constituted, entertained a motion during the course of a duly convened public meeting attended by representatives of NFG the NFG's GCR-4, as submitted, be rejected on account of its inclusion of the $.50 per MCF penalty related to SNG not to be purchased from Ashland.[5] The Commission members evenly divided in their vote on the question and thus, as is reflected in the Commission's minutes, the motion failed. Thereafter, the following colloquy took place between Commissioner Cawley, who, with Commissioner Taliaferro, opposed the motion, and Joseph Malatesta, Esquire, then the Commission's Chief Counsel:

> *Commissioner Cawley:* [T]he potential effects of denying incurred gas costs are catastrophic, I suspect, for all or most of these companies, and I would like you to check the law and make sure that they will go into effect as a result of a tie vote. Otherwise, we've got to do something about it quickly.

---

[5] The dollars amount of this penalty included in NFG's GCR-4 filing is $3,216,330.

*Mr. Malatesta:* Commissioner, we addressed this question yesterday in anticipation of the possibility [of a tie vote and] my belief [is] that the kind of system of review anticipated or created by Section 1307 of the [Public Utility] Code, that is, establishing automatic adjustment, means that, basically, the Commission has to act affirmatively to stop automatic adjustment; that, once a system is in place, that was put in place in May of 1978 for this GCR, it takes affirmative votes by the Commission, by a majority of the Commissioners, to put a stop to that process. Otherwise, the filing just goes into effect.

. . . .

*Commissioner Cawley:* [I]t is now your opinion that the NFG GCR [-4] will automatically go into effect?

*Commission Chairman Shanaman:* Although it is questionable.

*Mr. Malatesta:* It's not certain. It is an untested opinion, obviously. This matter has never been tested in the courts. The language of the statute is not unambiguous, but my best analysis is that it would go into effect automatically.

On September 1, 1981, NFG began to charge its customers rates calculated with reference to the contested GCR-4 filing. Three weeks later the Consumer Advocate filed with the Commission a complaint docketed to C-812654 in which the Consumer Advocate asked that NFG be ordered "to cease and desist collecting rates pursuant to its currently filed GCR No. 4 . . ." and averring that:

a) NFG is without legal authority to collect rates pursuant to GCR No. 4 because no valid

order of the Commission has been issued permitting the tariff rider to become effective. 66 Pa. C. S. §1307(a) and (b).

[and]

B) NFG's GCR No. 4 is unjust and unreasonable in violation of Section 1301 of the Public Utility Code, 66 Pa. C. S. §1301, because it is designed to collect "take or pay" charges of $.50 per MCF pursuant to a contract with Ashland SNG Corporation [sic].

NFG filed a responsive answer and the matter was assigned to Administrative Law Judge (ALJ) HERBERT S. COHEN. An evidentiary hearing was conducted on January 7, 1982, at which time the effect of the Commission's order entered one week earlier, on December 30, 1981, was considered. In the December 30 order, docketed to M-FACG 8004, as we have indicated, the Commission required NFG to refund some $13 million to its customers representing the cost of Ashland SNG previously purchased by the utility. The Commission additionally ordered as follows:

5. That the prior collection of the $.50 per MCF take or pay penalty through the operation of GCR-2, GCR-3, and GCR-4 is hereby approved, subject to audit pursuant to the provisions of 66 Pa. C. S. §1307(d) and further National Fuel Gas Distribution Corporation shall be permitted to include the costs of the $.50 per MCF penalty in all future GCR's, during the life of the contract. . . .[6]

---

[6] We discussed the apparent effect of this portion of the Commission's Order entered December 30, 1981, at *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* Pa. Commonwealth Ct. , , n.10, 464 A.2d 546, 560 n.10. NFG contends that this ordering paragraph must be construed to pre-

NFG contended that this decision rendered moot the objection of the Consumer Advocate to the effectuation of the utility's GCR-4 charges because the only opposition ever voiced to that filing was predicated on its inclusion, now expressly approved, of the $.50 per MCF penalty charge.

The Consumer Advocate requested an opportunity to review in detail the Commission's December 30, 1981 order. This request was granted by the ALJ and written argument was submitted in which the Consumer Advocate pressed a modified objection to the effect that, although the utility's GCR-4 was now unobjectionable, NFG should be required to refund to its customers the difference between the GCR revenues collected between the implementation of GCR-4 on September 1, 1981 and its approval on December 30, 1981 and the revenues that would have been collected during the same period had GCR-3 remained in force.

In support of its position the Consumer Advocate contended that Section 1307 of the Code requires prior approval by the Commission of GCR filings; and that

clude a refund of the interest on the excess of GCR-4 revenues over those of GCR-3 during the four month period prior to December 31, 1981. In its order docketed C-812654 and now subject to review, the Commission rejected this construction. We defer to the Commission's interpretation of its own Order and we note in this regard that the Commission's approval contained in its December 30, 1981 Order was directed toward the inclusion of the take-or-pay penalty in NFG's various GCR filings and not toward the whole of NFG's GCR-4 now at issue. That is, the Commission did not purport in its December 30, 1981 Order to approve NFG's GCR-4 and, therefore, we can discern no inconsistency between that Order and the later decision to require a refund. The Commission determined in its Order docketed to C-812654 and entered October 4, 1982, that it had no power to accomplish a retroactive approval of NFG's GCR-4. We do not decide this issue as it is unnecessary for us to do so.

the December 30, 1981 Order, to the extent it indicated retroactive approval of NFG's GCR-4, was on a number of grounds beyond the power of the Commission. In a decision dated June 1, 1982, the ALJ rejected these contentions and dismissed the Complaint of the Consumer Advocate.

Specifically, the ALJ held that neither Section 1307 of the Code nor the Commission's 1978 Order creating the GCR procedure require prior Commission approval of GCR filings; that the Commission is possessed of the power to approve retroactively a utility's GCR filing and that the Commission had, in its December 30, 1981 Order, done so with respect to NFG's GCR-4; and that the December 30 Order rendered moot any objections to that GCR-4.

Exceptions were filed and by order adopted August 13, 1982 and entered October 4, 1982, the Commission reversed the decision of the ALJ and concluded that NFG's implementation of GCR-4 prior to December 30, 1981 was unlawful. The text of the Commission's opinion in support of its Order, including the text of the pertinent statutory provisions follows:

During the pendency of the proceeding at R-79090956, on July 30, 1981, NFG filed its GCR No. 4 and related Tariff Supplement No. 3 to become effective September 1, 1981. Included within this filing was the $.50 perMCF penalty for SNG not taken under the Ashland contract.

At the public meeting held August 28, 1981, the four Commissioners then sitting considered, *inter alia*, the question of whether NFG should be allowed to implement its GCR 4. The decision resulted in a 2-2 tie. Effective September 1, 1981, NFG began charging rate payers the higher fuel costs contained in GCR 4. By

Order entered December 30, 1981, a majority of the Commission approved NFG's GCR 4.

The OCA argues that NFG possessed no authority to charge its customers the GCR 4 rate until such a rate was expressly approved, and that as a result, NFG has collected $8,-203,762[7] more under GCR 4 than it would have been entitled to if GCR 3 had been in effect from September 1 to December 31, 1981.

In his Initial Decision, the Administrative Law Judge concludes that our December 30, 1981 Order properly permitted NFG to include the $.50 per MCF penalty in its GCR 4 on and after December 30, 1981. He further finds that Section 1307(a) of the Public Utility Code provides the mechanism whereby an automatic adjustment clause may be collected and that Section 1307(b) permits a utility to implement those rates without express approval of the tariffs. We disagree.

Central to this controversy is Section 1307 of the Public Utility Code, 66 Pa. C.S. §1307, which provides in part as follows:

1307. Sliding scale of rates; adjustments

(a) General rule.—Any public utility, except a common carrier, may establish a sliding scale of rates or such other method for the automatic adjustment of the rates of the public utility as shall provide a just and reasonable return on the fair value of the property used and useful in the public service, to be determined upon

---

[7] This figure, representing the Consumer Advocate's determination of the amount by which NFG's GCR-4 revenues exceeded those that would have been collected had GCR-3 remained in force for the four month period prior to December 31, 1981, is noteworthy for the reasons explored at a later point in this opinion. *See* note 18 and the accompanying text.

such equitable or reasonable basis as shall provide such fair return. A tariff showing the scale of rates under such arrangement shall first be filed with the commission, and such tariff, and each rate set out therein, approved by it. The commission may revoke its approval at any time and fix other rates for any such public utility if, after notice and hearing, the commission finds the existing rates unjust or unreasonable.

(b) Mandatory system for automatic adjustment.—The commission, by regulation or order, upon reasonable notice and after hearing, may prescribe for any class of public utilities, except a common carrier, a mandatory system for the automatic adjustment of their rates, by means of a sliding scale of rates or other method, on the same basis as provided in subsection (a), to become effective when and in the manner prescribed in such regulation or order. Every such public utility shall, within such time as shall be prescribed by the commission, file tariffs showing the rates established in accordance with such regulation or order.

While we agree with NFG that Section 1307(b) requires us to establish a mandatory system for the automatic adjustment of rates and authorizes us to prescribe the form and content of the clause, we cannot agree that Section 1307(a) provides that by approving the form and content of the clause we have delegated, to the utility, the authority to bill customers for charges implementing that rate without our prior approval. In formulating that opinion, we cannot agree with NFG's contention that Section 1307(a) and (b) must be read sepa-

rately but, rather, conclude that the provisions are linked. While subsection (b) requires us to establish the form and content of the automatic adjustment clause, subsection (b) specifically refers to subsection (a) for the method of implementing that charge. By entering our order at Docket M-78050055, we merely established the method by which the automatic adjustment clause was to be calculated and not the individual rate to be charged by a utility. Were we to adopt NFG's reasoning, questions such as those which arose in NFG's GCR 4 could not have been considered by us.

Additionally, we cannot agree with NFG's contention that the word "rate" referred to in Section 1307 was intended to refer to the clause itself. A rate is defined in the Public Utility Code as a ". . . charge . . . or other compensation . . . and any rules, regulations, practices, classifications or contracts. . . ." 66 Pa. C.S. §102. Thus, we consider the *actual charge,* or dollar amount to be charged the customer and not the method of calculating that charge to be the rate.

Viewing Section 1307(a), we agree that a utility should initially set forth its calculations necessary to establish a sliding scale of rates that would provide a just and reasonable return. However, we are of the opinion that subsection (a) requires our approval of those individual rates. To allow a utility to implement rates on its own volition would be tantamount to delegating, to the very party we are bound by law to regulate, the authority to establish its own rates. Such a delegation of authority is clearly impermissible.

While the Commission accepted much of the reasoning of the Consumer Advocate, the requested relief—a refund of the revenue difference between GCR-4 and GCR-3 during the period prior to December 30, 1981—was not granted. On the question of appropriate relief, the Commission wrote:

The OCA suggests that we require NFG to refund the sum of $8,203,762 which was collected by NFG from its customers through implementation of its GCR No. 4 during the period September 1, 1981 to December 31, 1981. We disagree.

When one views the entire process involved in establishing and reviewing a GCR the issue presented by the OCA may be readily resolved. Upon an initial filing of the GCR by a utility, the calculations presented to us are merely estimates of anticipated costs. After approval of those estimates, the utility is authorized to collect those rates until further order of the Commission. Annually, we perform an audit of the *experienced* costs and compare those costs to the amount collected over the previous twelve months. At this point any refund for overcollection or recoupment for undercollection is authorized. Through this process we insure that a utility is made whole, while protecting ratepayers from any overcharges resulting from any inaccuracy of a utility's estimates. As the ultimate amount to be collected over a 11-month period is fixed, it would appear that the only benefit or detriment to a ratepayer or utility is what has been characterized as the "time value of money". In other words, as the costs to be recovered will be a sum certain, except for the time value of money, it would not

make any difference as to when the collection of those funds began.

By concluding that collection of the funds for GCR No. 4 prior to our approval was inappropriate, we must attempt to quantify this time value of money. Accordingly, we direct the Respondent to adjust its GCR No. 5 so that a refund will be made to ratepayers representing the interest accrued on its GCR No. 4 revenues collected to the extent they exceed the amount that would have been collected through its GCR No. 3 from the period September 1, 1981, through December 31, 1981;

. . . .

Thereafter, by Order adopted and entered December 3, 1982[8] the Commission gave effect to its refund requirement by rejecting two refund proposals of NFG and ordering

1. That the proper amount to be refunded by National Fuel Gas Distribution Corporation to its customers pursuant to our order at this docket entered on October 4, 1982 is $3,245,727 as explained in Appendix "A" of this order.

2. That the refund amout of $3,245,727 is not to be submitted as an undercollection for purposes of computing the [subsequent audit] statement [pursuant to Section 1307(e) of the Code] submitted by [NFG].

Appendix "A" referred to in ordering paragraph 1 is reproduced in the margin.[9]

---

8 Docketed to C-811654.

9 APPENDIX "A"
Representing an explanation of the calculation of amount
of interest required to be refunded by our October
4, 1982 Order at this Docket.

A Petition for Review to this Court was later filed by NFG and we must now determine the propriety of the Commission's refund requirement. In addition, NFG here challenges on both substantive and procedural grounds the amount of the refund contained in the Commission's order of December 3, 1982. The pertinent issues have been thoroughly briefed by the parties and there is general agreement that these issues primarily require for their resolution an interpretation and construction of a number of provisions of the Code including Section 1307.

Before commencing the inquiry, we will briefly describe the Gas Cost Rate procedure. As we recently wrote in Note 6 of our opinion in *National Fuel Gas Distribution Corporation,* at 464 A.2d at 552 n.6:

> The Gas Cost Rate mechanism for the automatic adjustment of gas cost charges is authorized by Code Section 1307, 66 Pa. C. S. §1307 entitled "Sliding scale of rates; adjustments" and by the Commission's Order of May 21, 1978, Docket No. M-78050055, reported at 52 Pa. P.U.C. 217-220. Such mechanisms are common and are denominated variously "fuel adjustment clauses," "purchased gas adjustment clauses," "escalator clauses," and "pass-through procedures." With differences in the

| Month | GCR No. 4 Actual Collections | Collections using GCR 3 Rate | Amount Overcollected | Interest Rate | Interest Weight | Interest |
|---|---|---|---|---|---|---|
| | $ | $ | $ | % | | $ |
| Sept. 81 | 11,830,700 | 9,615,337 | 2,215,363 | 15 1/2 | 18/12 | 515,072 |
| Oct. | 16,770,196 | 13,629,885 | 3,140,311 | 16 | 17/12 | 711,804 |
| Nov. | 20,868,324 | 16,960,616 | 3,907,708 | 16 3/4 | 16/12 | 872,721 |
| Dec. | 29,233,060 | 23,759,008 | 5,474,052 | 16 3/4 | 15/12 | 1,146,130 |
| | | | 14,737,434 | | | 3,245,130 |

details of operation, each mechanism allows the regulated gas utility to reflect in customer charges changes in the price paid by the utility for the gas it distributes without the necessity of preparation or approval of a revised tariff. That is, these mechanisms, by means of a formula like the one set forth at 52 Pa. P.U.C. page 219, pass through to customers changes in the utility's cost of gas. The constitutional validity of a similar automatic adjustment mechanism, the Energy Cost Rate applicable to electric utilities, was recently upheld in Allegheny Ludlum Steel Corporation v. Pennsylvania Public Utility Commission, Pa. , A.2d (No. 45 W.D. Appeal Docket 1982 & No. 5 W.D. Appeal Docket 1983, filed May 4, 1983).

The GCR here at issue is a "levelized" adjustment mechanism which means that the cost of gas passed through to the customer remains constant for a specified period—here one year — with an opportunity during subsequent annual periods for the utility to reconcile past over-collections or under-collections by charging increased or decreased rates to the extent that its predictions as to the cost of its purchased gas fell short of or were greater than the utility's actual experience.

The principles of utility ratemaking otherwise applicable, which principles the GCR procedure was designed to modify, are that no regulated utility may impose customer charges other than those set forth in the company's tariff on file with the Commission and that every revision of the filed tariff must be the subject of comprehensive prior administrative investigation and decision. In the case of gas distributors

like NFG, the most significant single component to be reflected in customer charges is the cost of gas to the utility. Recent experience, including variable regulatory edicts of the federal authorities, has shown this component to be volatile indeed. An inescapable consequence of these considerations, is the absence of a mechanism like that represented by the GCR, would be the necessity of frequent, even continuous, requests for rate increases brought by each gas utility and necessarily accompanied by equally frequent, even continuous, investigation and adjudication by the Commission.

Recognizing the practical impossibility of granting timely rate relief under such a regimen, the legislature and the Commission have for more than a decade permitted some form of automatic purchased gas cost pass-through to customers. The Fuel Adjustment Clause, the operation of which immediately preceded the Gas Cost Rate here at issue, permitted a monthly adjustment of customer charges reflecting changes in the utility's cost of the fuel it distributed. As has been indicated, the Commission first promulgated the detailed GCR mechanism by order in 1978 docketed to M-78050055. Two innovations were embodied in the GCR mechanism. First, unlike the monthly fluctuations permitted in the context of the Fuel Adjustment Clause, GCR charges were required to be "levelized" for an annual period based on the utility's projections as to gas supplies and costs during the coming year.[10] Second, the GCR mechanism required ninety percent of the resulting charges to be incorporated or "rolled into" the base rates reflected

___

[10] Subsequent audit by the Commission and the GCR formula's "E" factor then permits experienced over or under-collections to be reconciled by the utility and its customers.

in each customer's bill so as to prevent the GCR portion of the billing statement from overwhelming all other charges there set forth.

## The Issues

### (1) Power of the Commission to Require Prior Approval of GCR Filings.

The central issue presented by these appeals concerns the power of the Commission to require prior approval of gas utility GCR filings. This formulation of the issue is in pointed contradistinction to that of the parties which have framed and argued a different question, which we believe is not controlling: that of whether the Commission is *required,* by Code Section 1307 or otherwise, to adopt a mechanism of prior GCR approval. On the basis of an extended analysis of the language, syntax, and overall structure of Code Section 1307, NFG contends that there is no statutory requirement of prior GCR approval by the Commission. The Commission and the Consumer Advocate, on the other hand, predicated on a similar analysis, purport to find a requirement of prior approval in the interrelationship of subsections (a) and (b) of Section 1307.

In our view this analysis, although conducted by the parties with great sophistication and skill, misses the mark. We are not here presented with the Commission's refusal or failure to require prior approval or with a challenge to the statutory propriety of such a refusal or failure. It is conceded that the Commission has, since the inception of the GCR mechanism, consistently required prior approval of each utility's annual GCR filing.[11] The question of whether the

---

[11] See discussion contained in the dissenting opinion of Commissioner Cawley docketed to C-812654 and found at page 9 of that opinion:

Commission could have done otherwise, that is, whether the Commission could have dispensed with the annual approval process without offending the statute, is not before us. Simply put, we must here decide not whether some positive law *requires* the Commission to approve GCR filings before they become effective but whether some controlling authority *prohibits* the Commission from requiring its prior approval of such filings, as has been the Commission's consistent practice.

The resolution of this issue first requires an examination of Code Section 1307; the primary statutory authority for automatic rate adjustment mechanisms including the GCR. The statutory scheme contained in Section 1307(a) generally is the provision of a voluntary mechanism available to each utility (other than common carriers) by which the utility may propose to the Commission by means of a tariff filing an automatic adjustment mechanism incorporating any equitable and reasonable means to produce a just and reasonable return on the fair value of the utility's property used to provide the public service. The voluntary automatic rate adjustment mechanism of subsection (a) and the rates set forth in the tariff must be approved by the Commission before their effectuation and Commission approval may be revoked at any time following notice and hearing if it is determined that the rates produced by the adjustment mechanism are unjust or unreasonable.

Subsection (b) of Code Section 1307 authorizes the Commission, following notice and hearing, to

---

It has been Commission practice to act on these [GCR] recommendations by majority vote, in Public Meeting, by approving the charges that are to go into effect on September 1. As discussed below, this is not required by law or by the May 1978 order, but it has become customary. (Emphasis deleted.)

promulgate by regulation or order an automatic rate adjustment mechanism for any class of utilities other than common carriers and to mandate the use of such mechanism by each utility in the class. The mechanism prescribed by the Commission is to accomplish the regulatory purpose of automatic rate adjustment ''by means of a sliding scale of rates or other method, on the same basis as provided in subsection (a), [and is] *to become effective when and in the manner prescribed by [the Commission's] regulation or order.*''[12] In our view, the emphasized statutory language evinces an intent to leave to the Commission the procedural de-

[12] 66 Pa. C. S. §1307(b) (emphasis supplied). As indicated in the excerpt from its decision adopted August 13, 1982, the Commission was persuaded that the phrase "on the same basis as provided in subsection (a)" contained in Code Section 1307(b) and describing the effectuation of mandatory adjustment mechanisms meant that such mechanisms prescribed by the Commission were to be governed by the procedural requirement contained in Section 1307(a) including the requirement that "[a] tariff showing the scale of rates under such arrangement shall first be filed with the Commission, and such tariff, and each rate set therein, approved by it." We disagree. Section 1307(a) authorizes individual utilities to submit automatic adjustment mechanisms to the Commission for approval. In that context, the requirement of prior Commission approval of the mechanism and the customer charges produced by its operation is easily understood. Section 1307(b), on the other hand, concerns exclusively automatic adjustment mechanisms prescribed by the Commission in the form of an order or regulation applicable to each utility in a specified class and mandating that the adjustment mechanism be used by each such utility. A requirement that the mechanism then be submitted by the utility to the Commission for approval makes no sense. A requirement of approval of customer charges as opposed to the adjustment mechanism; which approval is at issue in the instant case, is understandable, as an abstract matter, in connection with the adjustment mechanism described in both subsections (a) and (b). The prior approval described in subsection (a), however, clearly applies to the mechanism itself as well as the customer charges thereby produced and, therefore, the prior approval of subsection (a) cannot have been incorporated in subsection (b).

tails relating to the approval and effectuation of the mandatory rate adjustment mechanisms prescribed pursuant to Code Section 1307(b). With respect to the customer charges produced by each utility's application of the mandatory adjustment mechanism to the particular facts of that utility's operations, the Legislature expressed in the final provision of subsection 1307(b), a clear commitment to the Commission's procedural expertise as follows: ''Every such public utility shall, within such time as shall be prescribed by the Commission, file tariffs showing the rates established in accordance with [the] regulation or order [of the Commission mandating the rate adjustment mechanism.]''

It seems clear to us, then, that among the powers given to the Commission by Code Section 1307(b) is that of designing detailed procedures by which a utility shall translate a mandatory rate adjustment mechanism prescribed by the Commission into particular customer charges. Moreover, the final sentence of Section 1307(b) expressly authorizes the Commission to control the timing and frequency of utility tariff filings containing explaining, and documenting this translation. For this reason, we must reject NFG's challenge to the Commission's requirement of annual submission and approval of customer charges produced by the GCR mechanism.

Our conclusion in this regard is further buttressed by the recent decision of the Supreme Court in *Allegheny Ludlum Steel Corp. v. Pennsylvania Public*

---

Instead, the statutory phrase at issue; "on the same basis as provided in subsection (a)," clearly refers to that portion of subsection (a) descriptive of the adjustment mechanism as a means to the accomplishment of the primary regulatory purpose of providing a fair return to the utility; as follows: "[the mechanism shall] be determined upon *such equitable and reasonable basis as shall provide such fair return.*"

*Utility Commission,* Pa. , 459 A.2d 1218 (1983). *Allegheny Ludlum* began as an action for declaratory judgment addressed to the original jurisdiction of the Commonwealth Court,[13] challenging on due process grounds the constitutionality of the automatic rate adjustment mechanism prescribed by the Commission with respect to two electric utilities. Specifically, Allegheny Ludlum Steel Corporation and Freedom Forge Corporation, customers of West Penn Power Company and Pennsylvania Electric Company respectively, contended that the ECR[14] rate adjustment mechanism was constitutionally infirm as permitting substantial increases in customer charges without the procedural protections of prior hearings and opportunity for public participation. The Commonwealth Court, sitting en banc, upheld the constitutional validity of the ECR because Code Section 1307 requires subsequent audit and the refund of overcollections attributable to the automatic rate adjustment mechanism and "because the proposed rates [produced by the ECR] are subject to review by a governmental body (PUC). . . ." *Id.* at 417, 447 A.2d at 683.

The Supreme Court affirmed and further elaborated on that facet of the interim administrative review of ECR charges which is the focus of the litigation in this case, as follows:

---

13 The opinion of this Court is reported at 67 Pa. Commonwealth Ct. 400, 447 A.2d 675 (1982). The consolidated actions addressed to our appellate jurisdiction were quashed as improper appeals from interlocutory administrative orders. *See* 67 Pa. Commonwealth Ct. at 408-409, 447 A.2d at 679.

14 The Energy Cost Rate or ECR is quite similar to the GCR here at issue in permitting an electrical utility to adjust customer charges to reflect estimated fossil fuel and ancillary costs for a future calendar year period. *See* 67 Pa. Commonwealth Ct. at page 406 n.5, 447 A.2d at 678 n.5.

[I]ndeed, the PUC must expressly approve ECR increases sought by [the electrical utility]. *Allegheny Ludlum Steel Corp. v. Pennsylvania Public Utility Commission,* Pa. , , 459 A.2d 1218, 1222 (1983). Hence, in the view of the Supreme Court, the presence of prior Commission approval of proposed ECR increases together with the opportunity of year-end audit, hearing, and refund, established the constitutional regularity of the automatic rate adjustment mechanism. That is, the Pennsylvania Supreme Court has recognized that the Commission does require prior approval and that this factor is important to establishing the constitutionality of the GCR automatic rate adjustment mechanism.

NFG contends in this regard that the concept of automatic rate adjustment and the necessity of prior Commission approval of proposed increases in customer charges are inherently inconsistent. With the necessity of such prior approval, it is argued, there is no sense in which the GCR operates "automatically" and no raison d'etre for Code Section 1307(b).[15] We disagree. As the Supreme Court explained in *Allegheny Ludlum, supra,* the annual inquiry of the Commission culminating in the approval or disapproval of proposed GCR customer charge revisions bears little resemblance to the evidentiary exploration and analysis conducted in the usual rate case. A utility's request for a rate increase other than Sec-

---

[15] Commissioner Cawley agreed with this contention. At pages 22-23 of his lucid dissenting opinion docketed to C-812654, he writes:

[T]he Commission is not required, either by subsections (a) or (b) [of Code Section 1307], to approve annually the [GCR] charges before they go into effect. If such a requirement was meant to exist, the Legislature would not have described these allowed methods of adjusting rates as "automatic." In fact, there would have been no reason to create Section 1307 at all.

tion 1307 GCR charge revisions, must be supported by an exhaustive evidentiary presentation of the utility's expenses and the reasonableness thereof, the fair value of the utility's property used and useful in the public service, and the return on that value fairly to be received by companies experiencing similar economic risks. To this end public comment is solicited, numerous and lengthy public hearings are conducted, lay and expert witnesses are examined and cross-examined, and, typically, thousands of pages of documentary evidence is submitted. The duration of such proceedings is frequently measured in years.

Consideration by the Commission of proposed GCR customer charge revisions, on the other hand, is preceded only by a brief documentary submission by the utility, analysis and a report by the Commission's staff as to compliance with the GCR formula and comparison of estimated gas supply costs with the estimates of similar utilities as contained in their annual GCR filings, and a hearing at which public comment is not permitted. *See Allegheny Ludlum Steel Corp. v. Pennsylvania Public Utility Commission,* Pa. at , 459 A.2d at 1222 (dissenting opinion of Mr. Justice Larsen). As in the instant case, decision of the formal propriety of the GCR customer charge revision encompasses a period of only weeks.[16] The very important sense, therefore, in which the GCR functions automatically and the central purpose of the mechanism described in Code Section 1307 is to permit the reflection in customer charges of changes in one component of a utility's

---

[16] NFG's revised annual filing was submitted on August 14, 1981; the initial decision of the Commission with respect to this filing, in which a tie vote was had on a motion to disapprove the revision for its inclusion of $.50 take-or-pay penalty, was made during the course of a hearing conducted two weeks later on August 28, 1981.

cost of providing the public service without the necessity of the broad, costly, and time-consuming inquiry required in the case of rate increases generally. The traditional formal Commission approval of such GCR customer charge revisions is wholly consistent with this purpose and the "automatic" functioning of the rate adjustment mechanism.

Having been offered no persuasive reasons why the Commission cannot require annual approval of NFG's GCR filing before the effectuation of the revised charges therein contained, and deferring, as we must, to the Commission's administrative expertise and to the interpretations of that body of its governing statute and regulatory pronouncements, we reject NFG's challenge to the requirement of prior approval made applicable to its GCR-4.

### (2) Power of the Commission to Require a Refund

NFG also contends that the Commission had no power in this case to order a refund. The matter of the Commission's power to require refunds is treated in Code Section 1312, 66 Pa. C. S. §1312 as follows:

> (a) General rule.—If, in any proceeding involving rates, the commission shall determine that any rate received by a public utility was unjust or unreasonable, or was in violation of any regulation or order of the commission, or was in excess of the applicable rate contained in an existing and effective tariff of such public utility, the commission shall have the power and authority to make an order requiring the public utility to refund the amount of any excess paid by any patron, in consequence of such unlawful collection.

The Commission here determined that having failed to approve NFG's GCR-4, the existing and

effective GCR filing of NFG during the period be-
tween September 1, 1981 and December 31, 1981 was
the utility's GCR-3. We have rejected NFG's argu-
ments that prior approval of GCR-4 was improperly
required by the Commission and we must, therefore,
reject the utility's derivative contention that refund
authority cannot be found in the statutory provisions
just set forth. Having determined that GCR-3 was
the effective rate and that NFG instead effected cus-
tomer charges at the higher level of GCR-4, the Com-
mission was empowered to require NFG to refund to
its customers the excess of GCR-4 charges over those
that would have been collected as a consequence of
the continued effectiveness of GCR-3.

### (3) The Amount of the Refund

We have held that the Commission was here au-
thorized by Code Section 1312 to require NFG to re-
fund to its customers the increased GCR-4 revenues
during the period prior to the Commission's approval
of those charges on December 30, 1981. However, as
the excerpt from its Order entered October 4, 1982
reproduced above indicates, the Commission instead
directed NFG to calculate and then to adjust its GCR-
5 so as to refund an amount "representing the inter-
est accrued on [NFG's] GCR No. 4 revenues collected
to the extent they exceed the amount that would have
been collected through its GCR No. 3 from the period
September 1, 1981, through December 31, 1981." On
November 1, 1982, NFG filed two proposed calcula-
tions of the required adjustment to its GCR-5.

Two proposals were submitted for alternative use
because NFG perceived an ambiguity in the refund
Order. We have explored briefly above the relation-
ship between GCR charges and base rates. It will be
recalled that GCR charges are annually "rolled-into"
base rates in order to prevent the GCR billing com-

ponent from ultimately overwhelming the base rate component and that the effect of this process with respect to NFG's GCR-4 filing as amended on August 14, 1981 was a reduction in the charge directly attributable to the GCR billing component. Therefore, without consideration of the anticipated purchased gas expense made a part of NFG's base rates, a literal construction of the refund formula would yield no principal amount by which GCR-4 revenues exceeded those of GCR-3 during the period at issue.[17] So construing the formula, NFG first proposed that no refund was required. Apparently recognizing the extent to which this interpretation ignored the Commission's clear intent, NFG proposed in the alternative a refund adjustment to its GCR-5 in the amount of $169,590.24 calculated by applying a monthly interest rate ranging from 15.5% to 16.75% to a monthly principal figure ranging from $1,123,800.00 to $2,776,853.00 and aggregating $7,475,942.00 for the four month period which principal figure was derived by including within GCR-4 revenues and hypothetical GCR-3 revenues the purchased gas expense made a part of NFG's related base rates.

---

[17] Specifically, NFG contended:

Under [the Commission's refund] order, it is necessary to determine whether there is any difference between "GCR No. 4 revenues collected" and "the amount that would have been collected through its GCR No. 3." The GCR No. 4 provided for a charge to customers in the amount of 22.22 cents per Mcf [net of gross receipts tax] while the charge to customers under GCR No. 3 was 28.17 cents per MCF, and, therefore, the "GCR No. 4 revenues collected" were less than "the amount that would have been collected through its GCR No. 3." Thus, there is no principal amount representing any "excess," and, therefore, there is no principal amount to which an "interest rate" could be applied. The conclusion is that there is no amount to be refunded.

. . .

By Order adopted and entered December 3, 1982, the Commission rejected both of NFG's proposed refund calculations. Appendix "A" to this Order, set forth in the margin, contains the Commission's calculations yielding an aggregate principal overcollection of $14,737,434.00 to which is applied a monthly interest rate ranging from 15.5% to 16.75% to produce the $3,245,727.00 refund now challenged. Thus, the Commission's revenue figures contained in Appendix "A" are approximately 100% greater than those presented by NFG and 80% greater than the principal refund amount proffered by the Consumer Advocate.[18]

NFG contends that its right to procedural due process was denied by the Commission's substantially unexplained rejection of the utility's refund calculations and equally unexplained and undocumented promulgation of Appendix "A" as the correct application of the refund formula to NFG's revenue experience. NFG protests that it was not provided the opportunity to present evidence on the issue of the revenues collected under GCR-4 or those that would have been collected under GCR-3 and that the provision of such an opportunity is a constitutional prerequisite to the taking of its property accomplished by the refund order.[19]

We need not decide this constitutional challenge; our difficulty with the procedure here employed is

[18] The Consumer Advocate's Brief docketed to C-812654 below requested a refund of $8,203,762.00 said to represent the excess of GCR-4 revenues over those of GCR-3 for the four month period prior to December 31, 1981.

[19] NFG also takes issue with ordering paragraph 2 of the Commission's Order entered December 3, 1982, which is as follows:

2. That the refund of $3,245,727 is not to be submitted as an undercollection for purposes of computing the 66 Pa. C. S. §1307(e) statement submitted by National Fuel Gas Distribution Corporation.

more fundamental. As an appellate court we must attempt to resolve the issues properly raised by the parties on the basis of the record. NFG correctly asserts that the instant record, although voluminous, contains no factual foundation for the Commission's calculations contained in Appendix ''A''; and the Commission's brief has directed our attention to no record evidence upon which its judgment that the appropriate amount of refund was $3,245,727 was based. We are therefore constrained to return the matter of the amount of refund to the Commission for further proceedings including the receipt of evidence as to the proper factual application of the refund formula. *Cf. T. W. Phillips Gas and Oil Co. v. Pennsylvania Public Utility Commission*, 50 Pa. Commonwealth Ct. 217, 412 A.2d 1118 (1980); *Equitable Gas Co. v. Pennsylvania Public Utility Commission*, 45 Pa. Commonwealth Ct. 610, 405 A.2d 1055 (1979); *Philadelphia Suburban Water Co. v. Pennsylvania Public Utility Commission*, 38 Pa. Commonwealth Ct. 614, 394 A.2d 1063 (1978). Jurisdiction is relinquished.

ORDER

AND Now, this 26th day of March, 1984, the Order of the Pennsylvania Public Utility Commission en-

---

The statutory provision referred to authorizes a utility, subject to subsequent audit, to recover from its customers any shortfall in revenues collected pursuant to the GCR with reference to the utility's experienced purchased gas expenses. NFG contends that the Commission has no power to prohibit in advance such a recovery of undercollections and the Commission offers in its accompanying opinion neither supporting reasoning nor authority for the prohibition. Inasmuch as we are compelled to return this matter to the Commission for further explanation with respect to the amount of the refund, we further direct the Commission, should it again prohibit subsequent recovery of NFG's experienced undercollections, to make appropriate findings and conclusions in support of that facet of the refund Order.

tered October 4, 1982 and docketed to No. C-812654 is affirmed and the Order of the Pennsylvania Public Utility Commission entered December 3, 1982 and docketed to No. C-812654 is reversed and remanded for further proceedings consistent with this opinion. Jurisdiction is hereby relinquished.