635 A.2d 675

**ENERGY PIPELINE COMPANY, a corporation, Energy Production Company, a corporation, Managing Ventures on behalf of Bessie 8, a Pennsylvania joint venture, and Bethlehem Steel Corporation, a corporation, Petitioners,**

v.

**The PENNSYLVANIA PUBLIC UTILITY COMMISSION and The Peoples Natural Gas Company, Respondents.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 15, 1993.

Decided Dec. 16, 1993.

---

John J. Porter, for petitioner Energy Pipeline Co. et al.

Joan O. Brandeis, for petitioner Managing Venturers of Bessie 8.

Patricia Krise Burket, Asst. Counsel, for respondent PA Public Utility Com'n.

Dennis J. Lewis, for respondent Peoples Natural Gas Co.

Before CRAIG, President Judge, and DOYLE, GARDNER COLINS, PALLADINO, SMITH, PELLEGRINI and FRIEDMAN, JJ.

FRIEDMAN, Judge.

Before this court are preliminary objections filed by The Peoples Natural Gas Company (Peoples) and The Pennsylvania Public Utility Commission (PUC) to a petition for review filed in our original jurisdiction by Energy Pipeline Company and Energy Production Company, Managing Venturers on behalf of Bessie 8, a Pennsylvania joint venture, and Bethlehem Steel Corporation (collectively, Bessie 8). The petition for review sought a declaration that a tie vote by the PUC constituted final action affirming the dismissal of Peoples' complaint against Bessie 8 and, therefore, the PUC was without authority or jurisdiction to proceed further in the matter.

On January 26, 1984, Energy Production Company (Energy Production), Energy Pipeline Company (Energy Pipeline), and Bethlehem Steel Corporation (Bethlehem Steel) entered into a Pipeline Construction, Natural Gas Sales and Transportation Agreement (Agreement). The Agreement provided for the sale of natural gas by Energy Production to Bethlehem Steel, and the construction and operation of a pipeline by Energy Pipeline to transport natural gas to Bethlehem Steel's plant in Johnstown, Pennsylvania. Energy Production and Energy Pipeline became the Managing Venturers of a joint venture known as Bessie 8, and entered into a joint venture agreement for the purpose of performing the obligations under the Agreement.

In October of 1985, Peoples filed a complaint with the PUC seeking a permanent order prohibiting Bessie 8 from supplying natural gas through its pipeline to Bethlehem Steel. In separate prehearing conferences, an administrative law judge

(ALJ) granted Bethlehem Steel permission to intervene on behalf of Bessie 8 and granted Peoples leave to amend its complaint. In its amended complaint, Peoples alleged that Bessie 8 had established extensive pipelines and facilities for gathering, transmission and distribution of natural gas service to the public and were providing unauthorized service to the Bethlehem Steel plant without having first obtained a certificate of public convenience, in violation of section 1101 of the Public Utility Code (Code), 66 Pa.C.S. § 1101.[1] The complaint also alleged that Bessie 8 had sought to provide natural gas service to numerous commercial and industrial customers in the vicinity of Peoples' production fields and had commenced service to Bethlehem Steel's plant in Johnstown, Pennsylvania. As relief, Peoples requested that Bessie 8 be prohibited from continuing this practice without prior PUC authorization, specifically with regard to servicing Bethlehem Steel. In its answer to Peoples' complaint, Bessie 8 denied that it was operating as a public utility, providing public utility service or violating the Code.

On April 21, 1988,[2] following extensive evidentiary hearings, the ALJ issued an initial decision denying and dismissing Peoples' amended complaint, finding that Bessie 8's activities were not subject to the PUC's jurisdiction because they were private in nature and did not involve any interstate, intrastate or public utility connections.[3] Peoples filed timely exceptions

1. Section 1101 of the Code, 66 Pa.C.S. § 1101, provides the following:
   Upon the application of any proposed public utility and the approval of such application by the commission evidenced by its certificate of public convenience first had and obtained, it shall be lawful for any such proposed public utility to begin to offer, render, furnish or supply service within this Commonwealth. The commission's certificate of public convenience granted under the authority of this section shall include a description of the nature of the service and of the territory in which it may be offered, rendered, furnished or supplied.

2. There appears to be some discrepancy regarding this date. While some of the documents refer to April 21, 1988 as the date of the ALJ decision, others specify that the ALJ issued his decision on March 24, 1988. In any case, however, this date has no effect upon our determination here.

3. The ALJ noted in his decision, "The natural gas production and the transportation facilities of the Bessie 8 Joint Venture are *exclusively*

to the ALJ's decision, to which Bessie 8 and Bethlehem Steel filed reply exceptions. At a public meeting on April 6, 1989, a four member PUC panel considered these exceptions and voted 2–2 on whether to affirm or reverse the initial decision of the ALJ.[4] Neither party filed exceptions nor appealed the PUC's April 6, 1989 action. However, more than three years later, on October 1, 1992, the PUC, on its own initiative, again considered Peoples' complaint and exceptions. This time, the PUC voted unanimously to sustain Peoples' exceptions and to grant the relief requested in Peoples' amended complaint, finding that Bessie 8's natural gas service constituted public utility service that was subject to PUC jurisdiction and regulation.

On October 30, 1992, Bessie 8 filed an original jurisdiction action in this court for review of the PUC's October 1, 1992 determination to sustain Peoples' exceptions to the ALJ's decision. The petition for review asks that we enter a declaratory judgment that the PUC's October 1, 1992 action was without legal effect because the 2–2 tie vote on April 6, 1989 constituted a final, appealable PUC action affirming the ALJ's dismissal of Peoples' complaint, and that, therefore, the PUC did not have jurisdiction or authority to proceed further in the matter. Alternatively, the petition for review requests that we issue a writ of prohibition barring the PUC from entering an order implementing its October 1, 1992 action. On December 1, 1992, the PUC and Peoples filed preliminary objections in the nature of a demurrer, claiming that Bessie 8 had failed to set forth a cause of action and had improperly invoked this

dedicated, by contract, to the use of BSC (Bethlehem Steel Corporation). The Bessie 8 pipeline transports only gas owned by BSC. The Bessie 8 pipeline transports only gas owned by BSC for the use of BSC. The entire Bessie 8 system contains no interstate pipeline connections, no intrastate pipeline connections, no public utility connections, nor any connections or sources of gas other than Pennsylvania native field production.' " (PUC opinion at p. 10, citing the ALJ decision.)

4. Pursuant to Section 301(a) of the Code, the Commission is comprised of five members. However, at the time the Commission voted, there was one vacancy.

court's original jurisdiction.[5]

■ The PUC and Peoples raise several issues in their preliminary objections, the most important being whether a tie vote by the PUC is determinative of the matter before it.[6] The PUC contends that pursuant to Section 301(d) of the Code, 66 Pa.C.S. § 301(d), a tie vote by the PUC is not determinative of the matter before it, but rather has the effect that no action has been taken and everything remains status quo. Accordingly, the PUC maintains that on October 1, 1992, it properly reconsidered the matter and voted again to determine whether Bessie 8 was in violation of the Code. We

5. Subsequently, on December 7, 1992, the PUC entered an order sustaining Peoples' exceptions and directing Bessie 8 to file an application for a certificate of public convenience and necessity within thirty days of its order. The PUC further ordered that if Bessie 8 did not comply, it must cease and desist providing natural gas utility service to the public, as it would be in violation of the Code.

   Clearly, the PUC's issuance of the December 7, 1992 order rendered Bessie 8's request for a writ of prohibition moot, and Bessie 8 responded by seeking review of that order by various means. On December 16, 1992, Bessie 8 filed a petition for reconsideration before the PUC, requesting that it reverse its December 7, 1992 order and grant an extension of time within which Bessie 8 could file its application for public convenience. The PUC granted Bessie 8 a sixty day extension but denied the request for reconsideration. On January 6, 1993, Bessie 8 also filed an appeal from the PUC's December 7, 1992 order under our appellate jurisdiction which is separate from the current proceeding. Finally, on February 1993, Bessie 8 filed an application for summary relief pursuant to Pa.R.A.P. 1532(b), in which Bessie 8 sought a prompt resolution of its petition for review in the nature of a declaratory judgment that, as an action taken after the PUC's April 6, 1989 tie vote, the PUC's December 7, 1992 order is void and of no legal effect. The motion for summary relief was consolidated with the argument on the preliminary objections filed by Peoples and the PUC which we now consider.

6. Peoples and the PUC also contend that this court lacks jurisdiction to grant the relief requested by Bessie 8. Essentially, they assert that by resorting to this court's original jurisdiction, Bessie 8 seeks to circumvent the requirement of appeal imposed upon a party aggrieved by an administrative agency's order. We disagree. In its original jurisdiction action, Bessie 8 does not attempt to collaterally attack the content of the PUC's order; instead, it seeks an adjudication of the PUC's statutory authority to issue the order at all, an issue appropriate for decision by this court rather than the PUC.

believe this argument is contrary to applicable case law and is based on a misinterpretation of section 301(d).

Section 301(d) of the Code, 66 Pa.C.S. § 301(d), provides the following:

(d) Quorum. A majority of the members of the commission serving in accordance with law shall constitute a quorum and *such majority acting unanimously, shall be required for any action,* including the making of any order or the ratification of any act done or order made by one or more of the commissioners. No vacancy in the commission shall impair the right of a quorum of the commissioners to exercise all the rights and perform all the duties of the commission. (Emphasis added.)

■ Section 301(d) provides that a "quorum," as that term is defined, is required before the PUC can vote. Section 301(d) also requires that if the quorum is composed of the minimum number of members, the vote must be unanimous. However, that situation is not involved here. No one can seriously question that where the PUC consists of five members, four PUC members exceeds the minimum number required for a quorum. Whereas, under 301(d), the lack of a quorum, or less than three members, legally prohibits decision making, the presence of more than three members guarantees that process. Thus, the failure to garner a majority of the quorum's vote is not the same as the lack of a quorum; the PUC and Peoples' reading of the statute mistakenly equates the two. We agree with the PUC and Peoples that a tie vote by the PUC retains the status quo; however, contrary to their assertion, the refusal to depart from the status quo does not constitute an absence of a decision but has the legal effect of denying the requested action. *Giant Food Stores v. Zoning Hearing Board,* 93 Pa.Commonwealth Ct. 437, 501 A.2d 353 (1985).

Here, Peoples filed exceptions to the ALJ's decision, requesting the PUC to overrule the ALJ and subject Bessie 8's activities to PUC jurisdiction. Peoples and the PUC would have us believe that because the PUC's vote on the matter

was tied at 2–2, it failed to act at all; however, Peoples and the PUC misperceive the legal effect of a tie vote. The PUC was not legally precluded from making a determination for lack of a quorum; rather, the required majority of PUC members failed to agree to take the action requested. Thus, the PUC effectively denied People's exceptions and affirmed the ALJ's decision that Bessie 8 was not subject to the PUC's jurisdiction. The effect of this affirmance was to put Peoples, who had sought to have the PUC regulate Bessie 8, out of court. *See also, Crossgates Inc. v. Board of Commissioners of Public Grounds and Buildings,* 145 Pa.Commonwealth Ct. 339, 603 A.2d 276 (1992) (Equally divided vote of the Board constituted a disapproval of the proposed lease rather than an absence of a decision.)

In *AT & T Communications of Pennsylvania, Inc. v. Pennsylvania Public Utility Commission,* 131 Pa.Commonwealth Ct. 390, 570 A.2d 612 (1990), we reaffirmed the well settled principle that "where a party requests an administrative body to take action on a matter, a tie vote by the body is equivalent to a refusal of the action." *Id.* at 399, 570 A.2d at 617. Relying on *AT & T,* Bessie 8 argues that the April 6, 1989 tie vote of the PUC constituted a final action rather than, as the PUC and Peoples contend, no action whatsoever under section 301(d) of the Code, 66 Pa.C.S. § 301(d). We agree. It is clear that in *AT & T,* all the parties, as well as the PUC and this court, considered a tie vote by the PUC as a final, appealable action. Indeed, in *AT & T,* we held that even where, following the vote, the PUC issued no formal written order to a party's request for action, the PUC's 2–2 vote alone constituted a *de facto* order subject to appeal.

In *AT & T,* we actually considered three separate PUC votes regarding the legality of an arrangement between interexchange and local exchange telephone carriers. In the first of these votes, taken on November 29, 1988, the PUC formally ordered an *ad hoc* committee to consider and resolve conflicting interpretations of the local exchange carrier's role in interexchange customer billing inquiries. Second, on June 27, 1989, *the PUC, by a 2–2 tie vote, rejected* the ad hoc commit-

tee's proposal without issuing a formal order. Third, after interexchange carriers filed timely petitions for reconsideration from the June 1989 decision, *the PUC, again by a 2–2 tie vote, denied* the reconsideration petitions without issuing a formal order. We held that both tie votes were final, appealable orders [7] and, with regard to the PUC's vote on the committee recommendation, we stated: "Because the commission's June 27, 1989 denial of the committee's proposal put the IXCs 'out of court' ... we conclude that the commission's denial is a final, appealable order." *AT & T*, 131 Pa.Commonwealth Ct. at 400, 570 A.2d at 617.

Admittedly, we never considered section 301(d) in *AT & T*; however, that does not prevent *AT & T* from controlling here. In fact, we did not consider that section in *AT & T* because, unlike the situation here, the PUC in that case properly accorded its tie votes the status of actions under section 301(d).[8] In *AT & T*, the PUC acknowledged that its split votes acted to deny the requests of the interexchange carriers and argued only that because it had issued no formal written orders rejecting the committee proposal or denying reconsideration, no final order existed which could be appealed.[9]

■ Where, as here, a divided vote confirms the status quo, the remedy of the aggrieved party is to appeal that determination through proper channels. *Giant Food.* Unlike the interexchange carriers in *AT & T*, Peoples did not avail itself of its opportunity for appeal in a timely fashion. To allow the PUC

7. With regard to the PUC's November 29, 1989 order, we held that it was not a final, appealable order, determining that the practical ramifications of that order did not put the exchange carrier out of court, but simply delegated the duty to a committee to interpret 52 Pa.Code § 64.22(2) regarding billing practices for residential telephone services, while it preserved the possibility of a future evidentiary hearing on the matter.

8. This is evidenced by the fact that when the interexchange carriers filed their Petitions for Reconsideration from the PUC's June 27, 1989 "decision", those petitions were entertained and acted upon by the PUC.

9. We rejected this argument, stating that where an administrative body issues no formal written order to a party's request for action, but does vote on the request, the vote constitutes a *de facto* order subject to appeal. *Id.*

to act on People's behalf, revisiting and reversing a decision three and one half years after it was made, would violate the principles of fundamental fairness. "Administrative action cannot violate the fundamental principles of fairness any more than it can impinge on any constitutional right." *AT & T*, quoting *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 171 Pa.Superior Ct. 391, 90 A.2d 850 (1952).

In sum, applicable law compels a determination that a tie vote of the PUC on appeal from the decision of an ALJ constitutes final action by that agency denying the relief requested. Neither Peoples nor the PUC has cited even one case where the effect of a tie vote has been construed as the total absence of a decision rather than a refusal to take action. Thus, the PUC's April 6, 1989 tie vote here constituted a final, appealable decision denying People's exceptions to the ALJ's ruling, and because Peoples never appealed from this final order, *see AT & T*, the ALJ's decision became final. Accordingly, because the PUC lacked authority and jurisdiction to reconsider the question *sua sponte* in 1992 or take further action on the matter, we dismiss the preliminary objections filed by the PUC and Peoples. Furthermore, we issue a declaratory judgment [10] to the effect that, for the reasons stated in this opinion, the PUC's 1992 order is invalid because the PUC lacked authority to issue it.

10.  This court has consistently agreed to issue a declaratory judgment in similar cases where the issue was the authority of an administrative agency or official under a statute or regulation. *See National Solid Wastes Management Association v. Casey*, 135 Pa.Commonwealth Ct. 134, 580 A.2d 893 (1990) (where Governor was without constitutional or statutory authority to issue an order, an action for declaratory judgment is the proper procedure to resolve the matter); *Spooner v. Secretary of the Commonwealth*, 114 Pa.Commonwealth Ct. 352, 539 A.2d 1 (1988), *aff'd*, 524 Pa. 584, 574 A.2d 600 (1990) (a consideration of an agency's jurisdiction under the Declaratory Judgments Act is appropriate to determine whether that agency has authority to act under a particular statute). Here, too, Bessie 8 does not take issue with the contents of the PUC's order but questions the PUC's authority to make such an order at all. *Allegheny Ludlum Steel Corp. v. Public Utility Commission*, 67 Pa.Commonwealth Ct. 400, 447 A.2d 675 (1982), *aff'd*, 501 Pa. 71, 459 A.2d 1218 (1983) (when petition did not challenge merits of PUC decision but the process employed by the PUC, declaratory relief is available).

## ORDER

AND NOW, this 16th day of December, 1993, the preliminary objections filed by the Pennsylvania Public Utility Commission and the Peoples Natural Gas Company are dismissed. Further, we enter a declaratory judgment as follows:

The April 6, 1989 vote in the proceedings at Public Utility Commission Docket No. C–850468 constituted final action dismissing the complaint of the Peoples Natural Gas Company and, therefore, the Pennsylvania Public Utility Commission lacked jurisdiction and authority to act further, rendering any action taken in the matter after April 6, 1989 void and without legal effect.

PELLEGRINI, Judge, dissenting.

I respectfully dissent. Rather than interpreting Section 301(d) of the Public Utility Code, the majority is rewriting it by holding that a tie vote has the legal effect of denying the requested action.

Section 301(d) of the Code sets forth the number of Commissioners of the Public Utility Commission needed for a quorum, as well as the number of votes needed for the Commission to take any action when there is a quorum. It provides:

(d) Quorum. A majority of the members of the commission serving in accordance with law shall constitute a quorum and such majority acting unanimously, shall be required for any action, including the making of any order or the ratification of any act done or order made by one or more of the commissioners. No vacancy in the commission shall impair the right of a quorum of the commissioners to exercise all the rights and perform all the duties of the commission.

The plain language of this section provides that a majority of the Commission members serving are needed for a quorum and the number needed for the quorum must act unanimously for the Commission to make any order or to take any action. By doing so, the General Assembly evidenced an intent that it did not want important matters to be decided by less than a majority of the members serving on the Commission, and that

delays in getting a majority are not important, considering that the matters before the Commission affect the parties and the public for years if not decades. When, as here, there are four members of the Commission attending a meeting, a majority, i.e., three votes, are needed for the Commission to undertake any action. A 2–2 vote is not a majority to take or deny action. Until the deadlock is broken either by a change of vote or the appointment of a fifth member, where the majority of the commissioners serving do not vote in favor or against a proposed action, the action is not approved or disapproved but held in abeyance.

Contrary to its clear language, the majority, in its operative paragraph,[1] makes a number of presumptions that are not supported by the language of Section 301(d). An analysis of the majority's operative paragraph shows the insupportability of its result. Specifically:

| Majority Opinion | Analysis |
|---|---|
| Section 301(d) provides that a "quorum", as that term is defined, is required before the PUC can vote. | Section 301(d) defines "quorum" as a "majority of the members of the commissions serving in accordance with the law." The number of commissioners needed for a quorum shifts, depending on how many commissioners are serving lawfully. |

1. The operative paragraph states:

Section 301(d) provides that a "quorum" as that term is defined is required before the PUC can vote. Section 301(d) also requires that if the quorum is composed of the minimum number of members, the vote must be unanimous. However, that situation is not involved here. No one can seriously question that where the PUC consists of five members, four PUC members exceeds the minimum number required for a quorum. Whereas, under 301(d), the lack of a quorum, or less than three members, legally prohibits decision making, the presence of more than three members guarantees that process. Thus, the failure to garner a majority of the quorum's vote is not the same as the lack of a quorum; the PUC and Peoples' reading of the statute mistakenly equates the two. We agree with the PUC and Peoples that a tie vote by the PUC retains the status quo; however, contrary to their assertion, the refusal to depart from the status quo does not constitute an absence of a decision but has the legal effect of denying the requested action. *Giant Food Stores v. Zoning Hearing Board*, 93 Pa.Commonwealth Ct. 437, 501 A.2d 353 (1985). (Opinion p. 678.)

Section 301(d) also requires that if the quorum is composed of the minimum number of members, the vote must be unanimous.

The number of commissioners needed for a quorum shifts with the number of commissioners serving. If only two members are serving lawfully, then two members constitute a quorum and action can be taken as long as the vote is unanimous. If three commissioners are serving, a quorum is also two, and even when all three commissioners attend, only two votes would be needed to take action.

No one can seriously question that where the PUC consists of five members, four PUC members exceed the minimum number for a quorum.

The factual difference is that there are only four members of the Commission serving. Moreover, while you can't question that four members exceed a quorum, so do three members because it is one more than two members needed for the quorum.

Whereas under 301(d), the lack of a quorum or less than three members legally prohibits decision making, the presence of more than three members guarantees that process.

A lack of a quorum is not less than three members but two commissioners. A 2–1 vote will also be effective to take action. Moreover, no explanation is given why more than three members guarantees decision making when you only need a majority acting unanimously to take action, and that can be as few as two.

Thus, the failure to garner a majority of the quorum's vote is not the same as the lack of a quorum.

Agreed that the failure to garner a majority is not the same as a lack of a quorum, but it ignores that Section 301(d) expressly provides that the majority of the quorum has to act unanimously for the making of any order.

The refusal to depart from the status quo does not constitute the absence of a decision but has the legal effect of denying the requested action.

Section 301(d) requires that a majority serving lawfully constitutes a quorum. A majority needed when four members are serving lawfully is three. Contrary to the majority's position, this section then states that three members need to act unanimously to take any action. Two of four does not constitute a majority.

The majority's analysis is flawed by its failure to recognize that there is a shifting quorum and it ignores that the Act requires a majority of the quorum to take any action. Nor can the majority find any support in *AT & T Communications of Pennsylvania, Inc. v. Pennsylvania Public Utility Commission*, 131 Pa.Commonwealth Ct. 390, 570 A.2d 612 (1990). In that case, we held that a 2–2 vote by the PUC was equivalent to a rejection of an ad hoc committee's recommendation regarding a local telephone exchange carrier's role in interexchange customer billing inquiries and, thus, was a final order from which an appeal would lie. *AT & T Communications* is not controlling because we made that determination as a result of finding that the practical ramifications of the PUC's order did not put the exchange carrier out of court, but simply delegated the duty to a committee to interpret 52 Pa.Code § 64.22(2) regarding billing practices for residential telephone services and it preserved the possibility of a future evidentiary hearing on the matter. Section 301(d) of the Code was never considered.

Because the PUC's tie vote did not constitute the taking of any action and the PUC had jurisdiction to reconsider Peoples' petition for review, Bessie 8 has no cause of action. Accordingly, I would sustain the PUC's and Peoples' preliminary objections and dismiss Bessie 8's petition for review.

PALLADINO and SMITH, JJ., join in this dissent.